UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DAVID HANSEN,<br><br>Defendant. | Case No. 4:18-cr-00346-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Pending before the Court is Defendant David Hansen's Motion for an Evidentiary Hearing and to Suppress (Dkt. 36) and Notice of previously unavailable standing evidence (Dkt. 60). The United State of America ("the Government") opposes the Motion.

In his Motion to Suppress, Hansen moves the Court for two things: (1) a *Franks* hearing to challenge the veracity of the warrant affidavit, and (2) the suppression of all evidence seized pursuant to the warrant. The Court has already ruled on the first issue. Dkt. 65. In its prior order, the Court denied Hansen's motion for a *Franks* hearing, but reserved ruling on the remainder of the Motion to Suppress until a hearing could be held.

It is also worth noting that in preparation for the (then scheduled) suppression hearing, Hansen served Rule 17(c) subpoenas on two individuals who were expected to testify. The Government moved to quash the subpoenas. Dkt. 75. The Court granted the

same. *Id*. In so doing, the Court further narrowed the focus of the suppression inquiry. *Id*. at 15–19.

The Court held oral argument on September 24, 2019, and took the remaining issues under advisement. The Court allowed the parties an opportunity to file closing briefs to summarize their positions in light of the evidence presented at the hearing. The Court has received and reviewed the parties' supplemental briefs. Upon review, and for the reasons outlined below, the Court DENIES Hansen's Motion to Suppress.

## II. BACKGROUND

The Government has charged Hansen with several counts of wire fraud and tax violations.[1] The charges followed a search of Yellowstone Partners, LLC's ("Yellowstone") premises, located in Idaho Falls, Idaho. At the time, Hansen was the CEO and owner[2] of Yellowstone, an investment advisory firm.

The search warrant in this case was predicated on a warrant affidavit written by FBI Special Agent Drew McCandless ("SA McCandless"). SA McCandless submitted the affidavit after interviewing current and former Yellowstone employees and an SEC investigator. In the affidavit, SA McCandless described how Yellowstone targeted certain customer accounts in an overbilling scheme. The affidavit also described how employees

---

[1] In the original indictment (Dkt. 1), the Government charged Hansen with 18 counts of violating 18 U.S.C. § 1343—wire fraud—and with 5 counts of violating 26 U.S.C. § 7206(2)—aiding and assisting in the preparation and presentation of a false and fraudulent, return, statement, or other document. In the superseding indictment (Dkt. 56), the Government charged Hansen with 23 counts of violating 18 U.S.C. § 1343 and 6 counts of violating 26 U.S.C. § 7206(2).

[2] Shortly before the search was executed, Hansen had pledged his 90% interest as security for a loan.

and customers raised their concerns with Hansen and with Yellowstone's Chief Compliance Officer, Cameron High,[3] only to have Hansen and High create excuses for the overbilling and pretend to resolve the problems. Additionally, Yellowstone often struggled to pay its own bills on time, yet Hansen used the Yellowstone operating account to pay his mortgage and loan payments for his Ferrari, a Falcon jet, and helicopter, which were held in separate LLCs. Based upon these and other facts, SA McCandless applied for a warrant to search Yellowstone for evidence of wire fraud, money laundering, and engaging in monetary transactions in property derived from specified unlawful activity.

United States Magistrate Judge Ronald E. Bush issued a warrant authorizing officers to search Yellowstone for information on servers, hard drives, and other media storage devices, as well as for hard copies of relevant documents. The search was primarily for financial records of Yellowstone, High, and Hansen. Officers imaged data and seized physical evidence. They specifically searched three offices: Hansen's office, High's office, and Kaylynn Dalebout's office.[4] They also searched the basement of the building where Yellowstone's server was located.

This is effectively Hansen's third attempt to suppress the evidence from that search. First, Hansen moved for a protective order preventing the Government from using any of the obtained electronically stored information ("ESI") gleaned from the search. The Court denied that motion. Dkt. 50. Second, Hansen requested a *Franks* hearing to challenge the

---

[3] High is a co-defendant.

[4] Dalebout was Yellowstone's accountant.

veracity of the underlying warrant affidavit. The Court denied that request. Dkt. 65. Now, in his third attempt, Hansen moves the Court to suppress all of the evidence obtained from the search. Hansen argues there was no probable cause for the warrant, or alternatively, that even if there was probable cause, the execution of the warrant violated his Fourth Amendment rights because the search exceeded the scope of the warrant and the Government took too long to search the ESI.

The Government responds by first arguing that Hansen does not have standing to challenge the warrant. The Government also argues that the good faith and inevitable discovery doctrines apply, meaning the Court cannot suppress the evidence because the Government was doing what it thought was correct under the warrant and because it would have inevitably obtained this same information through alternate means. According to the Government, either of those two arguments make it unnecessary to wade into the probable cause and reasonable execution analysis. Still, the Government argues that the warrant established probable cause, that the agents timely executed the warrant, and the agents searched only within the scope of the warrant.

### III. LEGAL STANDARD

"The Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands." *United States v. Leon*, 468 U.S. 897, 906 (1984). The exclusionary rule is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect." *United States v. Calandra*, 414 U.S. 338, 348 (1974). Under the exclusionary rule, "illegally seized evidence" cannot be used "against the search victim in a criminal trial." *Id.* at 350.

There is a "good faith" exception to the exclusionary rule "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope." *Leon*, 468 U.S. at 920. "In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient." *Id.* at 921.

Because "it frequently will be difficult to determine whether the officers acted reasonably without resolving the Fourth Amendment issue," a reviewing court may determine first whether there was probable cause and then whether the officer acted in good faith. *Id.* at 925

Great deference is accorded to a magistrate's determination of probable cause. *Id.* at 914; *Spinelli v. United States*, 393 U.S. 410, 419 (1969). However, "reviewing courts will not defer to a warrant based on an affidavit that does not 'provide the magistrate with a substantial basis for determining the existence of probable cause.'" *Leon*, 468 U.S. at 915 (quoting *Illinois v. Gates*, 462 U.S. 213, 239 (1983)). Probable cause for a search warrant exists where "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238.

"When officers violate the terms of a warrant in execution, partial suppression is the norm unless the officers engaged in a general search." *United States v. Sears*, 411 F.3d 1124, 1131 (9th Cir. 2005). "Wholesale suppression is an 'extraordinary remedy' that is appropriate 'only when the officers transform the search into an impermissible general search by ignoring the terms of the warrant and engaging in indiscriminate fishing.'" *Id.* (quoting *United States v. Chen*, 979 F.2d 714, 717 (9th Cir. 1992)).

# IV. ANALYSIS

Hansen's arguments fall into two general categories: (1) there was no probable cause for the search warrant (or for specific actions taken in light of the search warrant), and (2) the execution of the search warrant was unreasonable. The Government responds to those arguments after first challenging Hansen's standing. Because standing is a preliminary matter, the Court will address it first.

## A. Standing

"Standing" in this context is different and distinct from Article III standing. The Ninth Circuit has explained:

> The term "standing" is often used to describe an inquiry into who may assert a particular fourth amendment claim. Fourth amendment standing is quite different, however, from "case or controversy" determinations of article III standing. Rather, it is a matter of substantive fourth amendment law; to say that a party lacks fourth amendment standing is to say that *his* reasonable expectation of privacy has not been infringed. It is with this understanding that we use "standing" as a shorthand term.

*United States v. Taketa*, 923 F.2d 665, 669–70 (9th Cir. 1991) (emphasis in original) (internal citations omitted).

The Government argues that Hansen does not have standing to challenge the search of Yellowstone's offices, the desktop computers, or Yellowstone's server, but concedes that he has standing over the search of his personal cellphone. The Court will briefly address each argument raised by the Government in support of its motion.

### 1. Can Hansen present standing evidence in his Reply brief?

The Government begins by arguing that Hansen did not establish standing in his original Motion to Suppress and as a result, his motion must be denied. In the

Government's estimation, while Hansen claims he owned Yellowstone, he alleged no facts establishing a reasonable expectation of privacy. Hansen responded to these arguments in his reply brief, however, the Government asserts this tactic is improper because such would constitute new argument and evidence, and it did not have a fair opportunity to respond. The Court disagrees.

Hansen's assertions are not "new arguments" because those arguments substantively respond to the Government's Response brief. *See United States v. Bohn*, 956 F.2d 208, 209 (9th Cir. 1992) (accepting argument raised in reply because it was responsive to opposition brief); *Zkey Invs., LLC v. Facebook Inc.*, 225 F. Supp. 3d 1147, 1158 (C.D. Cal. 2016) (declining to strike argument and evidence offered in reply because it was in direct reply to the opposition); *Hodges v. Hertz Corp.*, 351 F. Supp. 3d 1227, 1249 (N.D. Cal. 2018) ("[T]he court has the discretion to consider new evidence presented on reply, particularly if the new evidence appears to be a reasonable response to the opposition."). Here, the *only* place Hansen could put this evidence in is his reply brief as he would not have been aware of it until the Government filed its Response to his motion. The Court finds that Hansen's arguments were timely and appropriate.

## 2. Can Hansen present additional standing evidence in a second motion?

Hansen filed a Notice (Dkt. 60) on July 7, 2019—more than two weeks after his Reply brief—which included further argument and evidence in support of his argument that he has standing to challenge the Government's search of Yellowstone and specifically certain offices and employees. Essentially this Notice is a motion to supplement.

At issue here are two versions of Troy High's affidavit. The Government in its Response brief to the original motion included only the second affidavit (created May 29, 2019), and Hansen claims he learned of an earlier affidavit (create May 28, 2019) on July 2, 2019, "as part of the 3,286-page, sixteenth discovery production." Dkt. 60, at 2.

The May 28 Affidavit includes two paragraphs omitted from the May 29 Affidavit. In all other respects, they are identical. Those paragraphs detail how Hansen asked Troy High for employees' computer passwords and downloaded software to access employees' computers. Hansen argues that this behavior demonstrates managerial responsibility and control and illustrates that Hansen's own computer was more private and secure than other computers at Yellowstone.

The Government explains that it asked Troy High "to excise those statements" because they "were superfluous to the suppression motion." Dkt. 63, at 4.

Further discussion on this point is unnecessary as Troy High testified at the suppression hearing and explained these comments in greater detail. To that end, the Court will give High's affidavit(s) and testimony the weight it deems appropriate. Accordingly, the Motion (Dkt. 60) to supplement is deemed MOOT.

3. *Does Hansen have standing over the search of his office and desktop computer?*

"It has long been settled that one has standing to object to a search of his office, as well as of his home." *Mancusi v. DeForte*, 392 U.S. 364, 369 (1968). In *Mancusi*, the United States Supreme Court held that an employee could "expect that he would not be disturbed by personal or business invitees, and that records would not be taken except with

his permission or that of his . . . superiors." *Id.* The Supreme Court also explained "that the situation was not fundamentally changed" when the office was shared. *Id.*

The Government attempts to argue that since Hansen did not lock his office and since his assistant had access to his office, he does not have standing over the search of his office. This argument fails to adequately exclude this case from the holding in *Mancusi*.

Similarly, the Government argues Hansen did not have exclusive use of his computer because Troy High, Yellowstone's Systems Manager, had administrative access to all Yellowstone computers and because Yellowstone's policy manual stated that "[e]lectronic communications are not private and may be monitored, reviewed and recorded by the Company" and that "[t]he Company's electronic communications are to be used for business purposes only." Dtk. 41-4, at 4.

This argument is also unpersuasive. The computer was in Hansen's office. As such, *Mancusi* applies to both the office and the computer. Furthermore, courts have repeatedly found that a person has standing over the search of his or her own office computer. *See, e.g.*, *United States v. Ziegler*, 474 F.3d 1184, 1190 (9th Cir. 2007) (finding employees have "a reasonable expectation of privacy in his office, [and] any search of that space and the items located therein must comply with the Fourth Amendment"); *Leventhal v. Knapek*, 266 F.3d 64, 73-74 (2d Cir. 2001) (finding the employee "had a reasonable expectation of privacy in the contents of his office computer" because the computer was not shared, and was in "a private office with a door." It did not matter that "technical support staff had access to all computers" and that there was an office policy prohibiting use for personal business); *United States v. Long*, 64 M.J. 57, 64 (C.A.A.F. 2006) (finding—among other

things—that because the computer was password protected, the computer user had standing over the search of that computer).

In sum, the Court finds that Hansen has standing to challenge the search of his office and to challenge the search of his computer.

4. *Does Hansen have standing over the search of other Yellowstone offices and the Yellowstone server?*

The Ninth Circuit has held that:

> The capacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place, but rather whether the individual by his conduct has exhibited an actual (subjective) expectation of privacy, and further, whether the individual's subjective expectation of privacy is one that society is prepared to accept as reasonable.

*United States v. Caymen*, 404 F.3d 1196, 1199 (9th Cir. 2005) (internal citations omitted).[5]

The question then, is whether Hansen had a subjective, reasonable expectation of privacy in Yellowstone employees' offices and the Yellowstone server.

In *United States v. Gonzalez*, the Ninth Circuit held that the owners of "a small, family-run business housing only 25 employees at its peak" had a reasonable expectation of privacy over intercepted phone calls that were not their own. 412 F.3d 1102, 1116–17 (9th Cir. 2005). The Court reached this conclusion "because the Gonzalezes were corporate officers and directors who not only had ownership of the Blake Office but also exercised full access to the building as well as managerial control over its day-to-day operations." *Id.* at 1117.

---

[5] This is the same standard for Hansen's office and computer, but *Mancusi* provides a shortcut to the same question. *See* Mancusi, 392 U.S. at 368. With a personal office, there is a reasonable expectation of privacy in that office. *Id.* at 369. With a password-protected office computer, there is a reasonable expectation of privacy in that computer. *Leventhal*, 266 F.3d at 73.

Later, the Ninth Circuit further explained:

> [E]xcept in the case of a small business over which an individual exercises daily management and control, an individual challenging a search of workplace areas beyond his own internal office must generally show some personal connection to the places searched and the materials seized. . . . Absent such a personal connection or exclusive use, a defendant cannot establish standing for Fourth Amendment purposes to challenge the search of a workplace beyond his internal office.

*United States v. SDI Future Health, Inc.*, 568 F.3d 684, 698 (9th Cir. 2009).

The Government argues Hansen and Yellowstone does not fit under the *Gonzalez* small-business rule. It notes that Yellowstone had 21 employees and 11 independent contractor investment advisors in 9 locations. Additionally, Yellowstone had assets under management of $862 million across 3,072 accounts.

The Government tries to further distinguish this case from *Gonzalez* arguing that Hansen did not actually own and manage Yellowstone at the time of the search because, in May 2016, Hansen pledged his 90% ownership stake to Doyle Beck in exchange for a loan. He also gave the title "Manager" to Beck.

Hansen pushes back, noting that not only was he the 90% owner and CEO of Yellowstone but he and his wife also owned the building that housed Yellowstone. Furthermore, he argues that a security interest is not an ownership interest, and provides an affidavit from Beck acknowledging Hansen owned Yellowstone at the time of the search and acted as "Manager," despite Hansen officially giving him that title. Hansen also contests the Government's calculation of employees, countering that Yellowstone only had 11 employees at the time of the search, not 21 as the Government asserts, and that only 7 of those employees worked at the Idaho Falls office. Finally, Hansen ardently maintains

that he exercised day-to-day managerial control at Yellowstone and had full access to the Yellowstone offices—including the server room.

Because Yellowstone had fewer employees than there were in *Gonzalez*,[6] the Court has no problem considering Yellowstone a "small business." And while Yellowstone managed $862 million in assets, it did not own those assets. Moreover, *Gonzalez* and *SDI Future Health* do not consider assets in determining whether a business is small. The number of Yellowstone locations also does not bar the "small business" label because the *Gonzalezes'* business had nine terminal offices in addition to its headquarters. Yellowstone likewise had employees and independent contractors in nine locations.

Most important to the Court's decision, however, is the fact that Hansen owned 90% of Yellowstone. He owned the building. He was the CEO. He managed the day-to-day operations. His personal office was located in Idaho Falls. That he pledged his interest and gave the title "Manager" to Beck is not sufficient to overcome Hansen's "daily management and control," especially when Beck said in his affidavit that Hansen managed Yellowstone at the time of the search. *See SDI Future Health*, 568 F.3d at 698.

Hansen has standing to challenge the search of the Yellowstone offices (his own and others) as well as standing to challenge the search of the server room.

## B. Probable Cause

In the Court's Memorandum Decision and Order on the *Franks* hearing (Dkt. 65), the Court ruled that there was sufficient probable cause to support the search warrant. The

---

[6] This is true whether the Government's number of 21 employees or Hansen's number of 11 employees is correct.

Court took this analysis a step further and found that even had Hansen shown some deficiencies in the probable cause affidavit, were the Court to amend the affidavit as Hansen saw fit, there still would have been probable cause to issue a warrant.

Hansen, however, continues to argue[7] that the search warrant did not establish probable cause to undertake specific actions. These arguments are closely tied to Hansen's "scope of the warrant" arguments,[8] however the Court will address them here.

As already noted, the Court gives great deference to a magistrate judge's determination of probable cause. *Leon*, 468 U.S. at 914; *Spinelli*, 393 U.S. at 419. However, "reviewing courts will not defer to a warrant based on an affidavit that does not 'provide the magistrate with a substantial basis for determining the existence of probable cause.'" *Leon*, 468 U.S. at 915 (quoting *Gates*, 462 U.S. at 239 (1983)). Probable cause for a search warrant exists where "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238.

Judge Bush determined there was probable cause to search for evidence of three crimes: (1) wire fraud, 18 U.S.C. § 1343; (2) money laundering, 18 U.S.C. § 1956; and (3) engaging in monetary transactions in property derived from specified unlawful activity, 18 U.S.C. § 1957. Dkt. 36-2, at 2.

---

[7] The Court is not implying that Hansen's argument is foreclosed by its prior rulings—except as to the search for tax records of the business—but simply that Hansen's argument is multi-faceted. He argues there was no probable cause to search in general, that there was no probable cause to search for specific items, and that the Government's search of some items and topics was overbroad or exceeded the scope of the warrant.

[8] For example, Hansen claims there was no probable cause to search the computer server and because of this, searching the server was outside the scope of the warrant and unreasonable.

The warrant affidavit provided Judge Bush a substantial basis for finding probable cause for each crime. The information in the affidavit laid out facts supporting the conclusion that Yellowstone overbilled home accounts—chosen because they were not subject to third-party review. The SEC identified over 180 overbilled accounts, and Yellowstone admitted to the SEC it overbilled clients approximately $5,281,585.46.

When customers and employees raised concerns about the overbilling, Hansen and High deflected and pretended to resolve the problems. The collected fees from the overbilled accounts were swept into a Yellowstone holding account and then wired to the Yellowstone operating account, which Hansen controlled. Deposits would appear in the operating account whenever the bookkeeper notified Hansen or High that it was overdrawn or too low to cover nearly due bills. Hansen also used the operating account to pay his mortgage and personal loan payments for a Ferrari, a Falcon jet, and a helicopter.

Additionally, Hansen instructed Yellowstone's bookkeeper to deposit checks from the operating account into Hansen's personal account when his personal house remodeling and landscaping expenses depleted his account. Furthermore, the affidavit established that such records would be located at Yellowstone, either as hard copies or as ESI.

The affidavit in this case clearly provided enough information for Judge Bush to conclude there was a fair probability that evidence of the above-mentioned crimes would be found at Yellowstone. Accordingly, on November 4, 2016, Judge Bush issued a search warrant authorizing the search of Yellowstone. Attachment B to the warrant defined the scope of the permissible search (in relevant part) as follows:

> 1. All records relating to violations of 18 U.S.C. § 1343 Wire Fraud, 18 U.S.C. § 1956 Money Laundering, and 18 U.S.C. § 1957 Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity . . . .

Dkt. 75-1, at 5. Additionally, Attachment B specified that agents could seize:

> c. *All records*, documents, materials, notes, and communications pertaining to the collection and expenditure of annual, semiannual, management and planning fees or any other expense or fee charged to an investor account.

> f. *Accounting records and other financial records* for Yellowstone and any related limited liability companies. Records include Financial Statements, General Ledgers, General Journal, Subsidiary Ledgers and Journals, Cash Receipts and Disbursement records and/or sales and purchase records and/or Payable Ledgers, check registers and/or copies of checks and *tax records including supporting schedules.*

> *Id.* at 5-6 (emphasis added).

At oral argument and in post-argument briefing Hansen appears to focus his arguments on four main issues:[9] 1) his personal—vs the business's—tax records, 2) hard copies of documents, 3) Kaylynn Dalebout's office, and 4) the computer server. The Court will address each in turn.

### 1. Tax Records

During the pendency of this litigation, Hansen has repeatedly asserted that there was no probable cause for the Government to retrieve and/or search for tax records. In his estimation, the warrant does not allow for this and doing so exceeding the scope of the warrant Judge Bush signed. The Court, however, has flatly rejected this argument.

---

[9] Again, there is some overlap between these arguments and what the Court groups in the following section when reviewing the reasonableness of the warrant's "execution" or scope, but they will be discussed here.

In its prior decision, the Court thoroughly analyzed this argument. The Court first found that Judge Bush's warrant clearly authorized law enforcement to search for all accounting records, financial records, and tax records. Dkt. 89, at 6-7. Second, in discussing Hansen's scope argument, the Court found that the agents did not abandon their search or actively search for evidence not authorized by the warrant because the offenses charged in this case substantially overlap. Dkt. 89, at 9. Ultimately the Court "specifically rule[d] that there is no evidence to support the contention that searches resulting in evidence of tax violations exceeded the scope of the warrant." Dkt. 89, at 18.

Hansen now, however, shifts his argument slightly[10] and contends that while the warrant may have justified a search for *Yellowstone's* tax records, it did not authorize a search for his *personal* tax records.

The Court's analysis in its prior decision rings true regardless of whether Yellowstone's tax records or Hansen's tax records are at issue. The fact remains that under *Johnston,* Government agents—operating under a valid warrant—can utilize evidence gleaned during its search for one crime in pursuing related crimes if the crimes are connected. In this case, the reality is that evidence of Hansen's tax violations was intermingled with evidence of his money laundering and wire fraud violations. *See United States v. Johnston*, 789 F.3d 934, 942-43 (9th Cir. 2015).

The close nexus between Yellowstone the company and Hansen personally is also

---

[10] Whether this is a narrowing of his previous argument or a nuance the Court failed to appreciate before is of little consequence. The parties have argued and briefed this issue and it is ripe for a determination by the Court.

relevant to the Court. As the Court already noted, Hansen owned 90% of Yellowstone. He also held personal assets in multiple LLC's and allegedly made payments on those personal items from Yellowstone's operating account.[11] To be sure, the Court is not approving overbroad, warrantless, "fishing expedition" searches. But the fact remains that the tax records in this case—Yellowstone's and Hansen's—are closely related to the crimes at issue. Yes, there are different and distinct elements that the Government must *prove* for each crime, but as the Court previously mentioned, these financial crimes have an "interrelated nature" and it is not difficult to see that a search for the one would likely turn up evidence of the other.

Again, the Court determines that the warrant clearly authorized the seizure of tax records from Yellowstone. Whether the warrant itself is broad enough to cover Hansen's personal tax returns is of little consequence because, even taking Hansen's position that the warrant *did not* authorize the search and seizure of his personal tax returns, the evidence need not be suppressed under *Johnston*.[12] The affidavit in this case detailed Hansen's

---

[11] Interestingly, the warrant specifically authorized the seizure of records from "Yellowstone *and any related limited liability companies*." Dkt. 75-1, at 5. Whether that includes Hansen's personal LLC's is debatable, but again, it ultimately does not matter.

[12] This statement may seem at odds with the preceding paragraph, but it is not. The Court is simply construing the inference in Hansen's favor. Even then, however, the argument is unavailing. Hansen continues to take issue with the Government's—and the Court's—assertion that these crimes are related. He contends that such an argument is "factually and legally false." Dkt. 99, at 5. Hansen goes on to argue the finer points of wire fraud, money laundering, tax law, revenue sources, liability, and standards of proof. *Id.* This information is all true: there are differences between the crimes at issue. But again, the distinction does not merit a differing result in this case. The bottom line is that these financial crimes are similar, the warrant authorized a search for materials that would form the basis for the crimes listed (then) and the crimes charged (now) and the Government agents did not go out of their way to find these "extra-warrant" crimes. Said differently, while the interconnectedness of the crimes is relevant to the Court, so too is the agents' conduct. They discovered this evidence *while complying with the warrant,* not through "rouge" actions, and because what they found was closely associated to the same underlying conduct, there was no need to obtain a second warrant.

involvement in financial crimes. The subsequent warrant authorized the Government to search for evidence relating to those crimes.

> Each of the search methods [the agents in this case] employed related directly to th[e] [warrant's] mandate. Nothing suggests that [the agents] directed [their] search efforts towards anything [other than what was prescribed in the warrant]. [They] were not digging around in unrelated files or locations that might have prompted the need for a second warrant. [The agent's] discovery of evidence of additional crimes is a reflection of the practical reality that [the crimes] were intermingled.

*Johnston*, 789 F.3d at 942-43.

The Court finds that there was probable cause to search for tax violations from Yellowstone and the subsequently discovered evidence of Hansen's personal tax violations did not exceed the scope of the warrant. The Court will not suppress this evidence.

### 2. *Hard copies of documents*

This argument is tenuous at best. Hansen essentially argues that because the affidavit in support of the warrant specifically noted that "Hansen hates paper files and keeps things in electronic form" (Dkt. 41-10, at 13) the Government was not authorized to seize any physical documents from Yellowstone—specifically his office.

Attachment B to Judge Bush's warrant repeatedly outlines that "all records, documents, materials, notes, and communications" can be seized. There is no indication that this directive applied solely to electronic copies, solely to physical copies, or included both, but it defies logic—even in a digital age—to reason that a search warrant for thousands of documents and materials would prohibit seizing physical documents.[13] The

---

[13] Again, the warrant does not specifically say "in any form—physical or electronic," but it does not limit the medium of production either. In the absence of a clear and unambiguous prohibition on physical evidence, the Court cannot accept Hansen's argument.

Court finds no basis for this argument and will not suppress the seizure of physical documents from Yellowstone.

### 3. Kaylynn Dalebout

Relatedly, Hansen argues that there was no probable cause to search Kaylynn Dalebout's office or seize physical documents from her office. The Court has already dismissed the physical documents argument, but must separately address searching Dalebout's office on the whole.

Kaylynn Dalebout was Yellowstone's accountant/financial controller. Hansen is correct that the warrant application did not personally name Dalebout in any way. That said, the warrant specifically authorized the seizure of "any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant." Dkt. 75-1, at 6–7. It goes without saying there was a fair probability that financial records, client records, accounting records, and frankly most of what is called for in the warrant, would be found in the Company's accountant's office and on her computer.

Ultimately, the Court will not suppress this evidence for three reasons. First, the search warrant authorized the search and seizure of this exact type of evidence. Second, even assuming arguendo there was no probable cause, the Government's reliance on the good faith exception would apply.[14] Third, and finally, there is not actually anything to suppress. While the Government "imaged" Dalebout's computer, it apparently did not

---

[14] "In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient." *Leon*, 468 U.S. at 921. As such, there is a "good faith" exception to the exclusionary rule "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope." *Leon*, 468 U.S. at 920.

search or seize anything from it.[15] The Court finds the Government did have probable cause to search and seize materials from Dalebout's office.

### 4. Server

Finally, Hansen argues that because the server was located in the basement of Yellowstone's building—and that basement is shared with other tenants in the building—the Government did not have any right to search there. This argument too flies directly in the face of the plain language of the warrant affidavit and the warrant itself.

The affidavit of probable cause in this case specifically outlined that "Yellowstone's investor agreements are held on a computer which is located in the basement of the Yellowstone office located at the PREMISES" (Dkt. 41-10, at 12) and that "the fee billing spreadsheets High submitted to the investment custodians could be saved to the desktop hard drive or the server located in the basement of the PREMISES" (*Id.).* The warrant in turn, defined the "PREMISES" as "a two story business office *with a basement*" located at a specific address. Dkt. 75-1, at 3 (emphasis added). Hansen's argument that other tenants in the building shared the basement space is of little importance. Even assuming others had access to *the basement*, there is no indication that the *server room* itself was shared or accessible by anyone other than a select number of employees at Yellowstone—in fact there is testimony to the contrary. Accordingly, it was only Yellowstone or Hansen that had any privacy interest in the server room and that interest was extinguished under the warrant. In short, the Government had probable cause to search the server room and the

---

[15] Assuming, however, that this is an exaggeration and the Government did search and/or seize materials from Dalebout's computer, those actions would be justified under the first and second reasons outlined.

server. Those efforts did not exceed the scope of the warrant and the Court will not suppress any information obtained from that source.

## C. REASONABLE EXECUTION OF THE WARRANT

Regardless of the probable cause determination, Hansen also argues that the way in which the Government executed the warrant violated his Fourth Amendment rights. Hansen makes two primary arguments in this regard: (1) the duration of the ESI searches was unreasonable; and (2) the search in generally, as well as the ESI searches (via "search terms") exceeded the warrant's scope. The Court will address each argument in turn.

### 1. Duration of the ESI searches

Federal Rule of Criminal Procedure Rule 41 provides:

A warrant under Rule 41(e)(2)(A) may authorize the seizure of electronic storage media or the seizure or copying of electronically stored information. Unless otherwise specified, the warrant authorizes a later review of the media or information consistent with the warrant. The time for executing the warrant in Rule 41(e)(2)(A) and (f)(1)(A) refers to the seizure or on-site copying of the media or information, and not to any later off-site copying or review.

Fed. R. Crim. P. 41(e)(2)(B).

Rule 41 provides no timeframe within which the later review must be completed, and the Fourth Amendment requires only that it be completed within a reasonable time. *United States v. Knights*, 534 U.S. 112, 118 (2001) ("The touchstone of the Fourth Amendment is reasonableness . . . ."). Of note, the Ninth Circuit has affirmed the denial of a suppression motion where the search of one computer took much longer than it did in the instant case. *Johnston*, 789 F.3d at 941-942 (holding that five-year search period, in which searching happened in three distinct phases, was reasonable); *United States v. Wetselaar*,

2013 WL 8206582, at *7 (D. Nev. 2013) (two-year search); *United States v. Jarman*, 847 F.3d 259, 266 (5th Cir. 2017) (upholding 15-month search, after 8-month filter review).

Officers in this case seized over 2.5 terabytes of data from multiple devices. The data was reviewable beginning January 24, 2017, after the filter team processed the information. SA McCandless conducted searches during the following periods: February–September 2017, January 2018, June 2018, July 2018[16], October 2018, and January 2019.[17] The Government maintains this timeline was reasonable considering SA McCandless was the only FBI agent who conducted the searches and was one of only two agents in Boise assigned to investigate financial crimes. Not only was there a significant amount of data seized, but the warrant also allowed for broad searches, often using phrases like "[a]ll records relating to ____" or "[a]ll records, documents, materials, notes, and communications pertaining to ____." Dkt. 75-1, at 5-6.

Hansen relies heavily on *United States v. Wey*, to support his assertion that the Government in this case has not been acting in good faith. In *Wey*, the Court said it was not aware of any authority "suggesting that simply because it ha[d] retained all originally searchable electronic materials, the Government [was] permitted to return to the proverbial well months or years after the relevant Warrant ha[d] expired to make another sweep for relevant evidence, armed with newly refined search criteria and novel case theories." 256 F. Supp. 3d 355, 406 (S.D.N.Y. 2017). According to Hansen, this is precisely what the

---

[16] IRS SA Melissa Ripley ("SA Ripley") collaborated with SA McCandless in the July 2018 searches.

[17] In the Government's Motion to Quash, the Government notes six other search days after January 2019. Dkt. 75, at 4. Since the date the parties filed their briefing for this motion, there may yet have been other searchers the Court is not aware of.

Government did, and continues to do, in this case.

Relevant, however, is the very next line in *Wey* where that Court found that "perhaps most plainly problematic on this score are Agent Miller's 2015 searches which, as noted, covered all documents in the FBI databases, including those materials *already sorted out as impertinent* two years earlier." *Id.* (emphasis in original). The Court there said those searches were "akin to the Government seizing some hard-copy notebooks while leaving others it deemed unresponsive behind, and then returning to the premises two years later to seize the left-behind notebooks based on investigative developments but without seeking a new warrant." *Id.* at 406–07. That distinction is critical here as there is no evidence that the Government is *returning* to former searches as opposed to simply continuing their original search—albeit over time.

Considering the vast quantity of ESI seized from Yellowstone coupled with the limited resources available to the Government, the Court finds that the timeline of the searches was reasonable.

### 2. *Scope*

In light of the Court's prior decisions—as well as prior sections in this decision—the Court has effectively ruled on this argument. However, to review:

The warrant in this case established the scope of the search and seizure of documents and evidence from Yellowstone. Dkt. 65. That warrant was supported by probable cause. *Id.*

The Government's searching of Yellowstone's tax records was authorized by the warrant itself (*see supra* Section IV(B)(1)) and the eventual search and seizure of Hansen's

personal tax records was not outside the scope of the warrant and/or will not otherwise be suppressed as outlined above (*Id.; see Johnston,* 789 at 942-43). The Government, at no time, turned the warrant in this case into an impermissible general search warrant. Dkt. 89, at 6–9.

Seizing hard copy documents, searching Dalebout's office, and searching the server room did not exceed the scope of the warrant. *See Supra* Section IV(B)(2)-(4).

As for ESI, the "search terms" the Government employed in searching and analyzing the data did not exceed the scope of the warrant (Dkt. 89, at 11–12) nor did the manner (multiple government agents and agencies in a multi-step process) in which the data was reviewed and extracted. The time it took the Government to evaluate the data, while lengthy, did not exceed the scope of the warrant or violate Hansen's Fourth Amendment rights. *See Supra* Section IV(C)(1).

For the reasons set forth in this—and prior—decisions, the Court finds that the Government did not exceed the scope of the warrant in any material respect. [18]

## V. CONCLUSION

While Hansen does have standing to challenge the warrant in each of the ways he has endeavored to in this case, his arguments are unavailing. There was probable cause for

---

[18] The Government raises three other "defenses" to Hansen's argument: the good faith doctrine, the inevitable discovery doctrine, and the independent source doctrine. While these arguments do have merit (for example, there is no indication that law enforcement flagrantly disregarded the warrant, therefore, any mistakes in interpreting the warrant would likely be covered by the good faith exception; also, many of the documents at issue here were simultaneously produced from other sources, witnesses, and agencies so the independent source doctrine would likely apply) the Court need not analyze these doctrines as it has determined there were no Fourth Amendment violations in this first instance. Likewise, the Court need not discuss the level, or scope, of suppression as it finds suppression (in any form) is unwarranted.

the search. There was probable cause for the methods employed, the offices, personnel, and places searched during the execution of the warrant and none of the Governments' actions were unreasonable or exceeded the scope of the warrant. The searching of the ESI, in time and scope, was likewise reasonable.

"The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Knights*, 534 U.S. at 118–19. After a thorough review of the evidence and testimony in this case, the Court finds that the Government did not violate Hansen's Fourth Amendment rights. The Court will not suppress any of the evidence.

## VI. ORDER

THE COURT HEREBY ORDERS:

1. The Motion for an Evidentiary Hearing and to Suppress (Dkt.36) is DENIED.[19]

2. The Motion Notice of previously unavailable standing evidence (Dkt. 60) is DISMISSED as MOOT.

DATED: November 7, 2019

David C. Nye
Chief U.S. District Court Judge

---

[19] The Court already DENIED in PART the portion of Hansen's motion related to the *Franks* hearing (*see* Dkt. 65), but now DENIES the remaining issues raised in that motion.