CURTIS SMITH, ESQ.
Idaho State Bar No. 4798
SMITH, WOOLF, ANDERSON & WILKINSON, PLLC
3480 Merlin Drive
Idaho Falls, ID 83404
Telephone: (208) 525-8792 / Facsimile: (208) 525-5266
Email: curtis@eastidaholaw.net

LUIS E. QUINONES FERNANDEZ, ESQ. (*Admitted Pro Hac Vice*)
Illinois State Bar No. 6330314
Faegre Drinker Biddle & Reath, LLP
311 S Wacker Dr., Suite 4300
Chicago, IL 60606
Telephone: (312) 212-6500 / Facsimile: (312) 212-6501
Email: luis.quinones@faegredrinker.com

Attorneys for Defendant, David Hansen

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 18-cr-00346 |
| Plaintiff, | |
| v. | Honorable David C. Nye |
| DAVID HANSEN, | |
| Defendant. | |

## DAVID HANSEN'S SENTENCING MEMORANDUM

## TABLE OF CONTENTS

I.      The Legal Standards Governing Sentencing.......................................................... 4

II.     The Nature and Circumstances of Mr. Hansen's Offense and His Remarkable
        Corrective Action ..................................................................................................... 5

III.    Dave Hansen's Broader Character and History ..................................................... 12

        A.      Dave's Extraordinary History of Philanthropy and Community
                Involvement .................................................................................................. 14

        B.      Dave's Unwavering Support of Family ....................................................... 22

        C.      Dave's Civic Commitment and Support of Community ............................... 24

        D.      Dave's Acceptance of Responsibility and Personal Transformation................... 26

        E.      Dave's Professional Transformation............................................................ 29

IV.     The Sentence Requested By The Government Is More Than Minimally Necessary
        and Would Not Be a "Just Punishment." .............................................................. 31

V.      Dave Hansen Has Learned His Lesson – His Story Is Already a Cautionary Tale. ......... 33

VI.     Unwarranted Sentencing Disparities...................................................................... 35

VII.    The Meaning of COVID- 19.................................................................................... 36

        A.      A Prison Pandemic....................................................................................... 36

        B.      Mr. Hansen May Be At a Higher Risk for COVID-19. ............................... 42

VIII.   Mr. Hansen's Sentencing Request ......................................................................... 44

        A.      A Sentence of Probation with Home Confinement is Appropriate Under
                the Current Unique Circumstances. ............................................................. 44

        B.      Alternatively, the Court Could Use its Vast Discretion to Impose a Term
                of Home Detention Before Incarceration...................................................... 47

        C.      A Guideline Sentence Is Excessive.............................................................. 47

IX.     Restitution ............................................................................................................... 50

X.      The Court Should Not Impose a Fine ..................................................................... 50

XI.     Conclusion .............................................................................................................. 51

US.128311917.03

## DAVID HANSEN'S SENTENCING MEMORANDUM

Dave Hansen took client funds to pay for personal and professional expenses in excess of his clients' investment agreements.  This case, however, is not the typical example of greed and excess that the government presents.  There is nuance to the Hansen story—the type of nuance that can often be lost in truncated plea and sentencing proceedings.  That nuance is not an excuse; it's not a justification.  It is important, however, to understand Dave, his life, his response to his own criminal conduct, and the actual effect his actions had on Yellowstone's clients in approaching his sentencing.  As the Court will read, Dave's extraordinary history of philanthropic altruism and community involvement and his exceptional efforts to remediate any potential harm caused by his misappropriation of client assets truly differentiates his case.  It is no exaggeration to state that through years of charitable efforts, Dave has literally changed lives.  And, despite the length and scope of his criminal conduct, Dave took every action he could to make his victims whole.  Dave's story, when more fully understood, necessitates a sentence that falls well below the otherwise applicable Guideline range.  In particular, Mr. Hansen submits that a sentence within the 41 to 51-month range would be more befitting of his conduct.  In light of his truly exceptional humanitarian work, a sentence at the low end of that range—or below—is appropriate.

It is impossible, however, to proceed with sentencing without acknowledging this unique moment in history.  As the country and this Court try to return to functionality against the challenges created by the COVID-19 pandemic, we must acknowledge the many ways in which the virus has affected us and continues to do so.  The Court will sentence Mr. Hansen—a non-violent first-time offender convicted of an economic crime who has already made near complete restitution—at the very moment that, pursuant to Attorney General William Barr's direction, the Bureau of Prisons has been transitioning prisoners convicted of similar offenses from federal

facilities to home confinement to address the still escalating threat COVID-19 presents to the federal inmates and the Bureau of Prisons' staff who guard them.  The Court's sentence can and should account for these unique challenges.  In particular, to the extent possible, the Court should order Mr. Hansen to serve his sentence on home confinement outside the pandemic-stricken BOP's facilities.

## I.        The Legal Standards Governing Sentencing

It has long been "the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996).  Following the United States Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), the Court has significant freedom to fashion a sentence that considers the unique circumstances of each defendant, his conduct, its import, and its place in time and not simply the Guideline calculations applicable to his offense.

Consistent with this tradition of individualized justice, this Court should look beyond the narrow bandwidth of an otherwise applicable guidelines range and thoughtfully and carefully consider each of the individualized sentencing considerations set forth in Section 3553(a) to fashion a sentence in which the punishment imposed "fit[s] the offender and not merely the crime." *Pepper v. United* States, 131 S.Ct. 1229 (2011) (citations omitted).  It is axiomatic that in fashioning such a sentence, the Court should ensure that it imposes a sentence that is "sufficient, but not greater than necessary" to satisfy the purposes of sentencing.  18 U.S.C. § 3553(a).  This directive—that a sentence should be what is *minimally necessary* in each individual case— necessitates an understanding of the man as well as his conduct before a sentence is imposed.  In light of these bedrock principles, Mr. Hansen offers the following insight into himself, his action

US.128311917.03

and its impact under the rubric of Section 3553(a)'s applicable sentencing factors, which he respectfully submits necessitates a below Guideline sentence.

## II.    The Nature and Circumstances of Mr. Hansen's Offense and His Remarkable Corrective Action

This is not a typical investment fraud case.  Yellowstone Partners was not some ruse used to separate investors from their cash.  It was a successful investment advisory firm.  Unfortunately, Dave Hansen billed certain client accounts for fees in amounts that exceeded the parameters of Yellowstone's investment agreements.

Dave Hansen purchased the investment portfolio business that was to become Yellowstone in 2004.  When Dave first opened Yellowstone's doors, the company had three employees and managed approximately $100 million in client assets.  Dave was an exceedingly hard-working businessman.  He worked to expand Yellowstone's reach not only throughout the Mountain West, but eventually to Arizona, California, Washington, and as far as Kentucky, Ohio and New York. Selling quality financial guidance and management, over the dozen years that he owned the company, Dave was able to expand Yellowstone to roughly $960 million under management.

Although a talented advisor, Dave Hansen was not, himself, much of an investor.  While Dave understood markets and knew how to increase the value of clients' capital, he did not save and invest the significant income he began to earn.  Rather, nickels burned holes in Dave's pockets. Dave assumed his hard work would be rewarded with additional successes and income.  The steady continued growth of Yellowstone helped validate those expectations.

The extravagance upon which the government would ask the Court to focus was real; and the spending undoubtedly got ahead of Dave.  He borrowed money to buy a wonderful home for his family and a vacation home in Arizona.  Dave bought a plane, a helicopter and another plane

after that.  There were luxury cars and expensive vacations.  These purchases required significant up-front capital, but the bulk of the cost was financed through commercial lending.

In addition to Yellowstone's significant organic growth, Dave ambitiously pushed Yellowstone further forward through the acquisition of new books of business.  Dave borrowed additional funds to finance these strategic expansions.  With its increasing clientele, Dave also increased Yellowstone's staff.  A company that had begun with 3 employees in Idaho Falls expanded to over 20 employees and 12 independent advisors in 10 locations.

Although Yellowstone was quite successful, its income was regularly irregular.  Client accounts were billed quarterly, supplemented by larger, one-time annual fees.  *See* PSR, ¶ 11. Yet, Dave's growing personal and professional obligations were due monthly.  The result was periodic liquidity crunches.  Cash became tight for both Dave and Yellowstone before the reprieve of another Yellowstone billing cycle.  At first, Dave's solution was to transition accounts to advance billing from billing for services previously rendered.[1]  One by one and then groups at a time, Yellowstone transitioned its customers from charges paid in arrears to advance billing.  When cash remained tight, however, Yellowstone "extended" the period of advance billing, "resetting" customers' billing timeline, billing a percentage of clients' annual fees early (in theory, moving their next billing date back), and, through this process, billing further and further in advance.  In time, Yellowstone's billing requests were simply divorced from customer fee arrangements altogether.  The effect of these practices was that Yellowstone billed certain customers far in excess of the amounts then due under their contracts.

---

[1]    If consistent with customer investment agreements, advisory firms like Yellowstone were permitted under applicable regulations to bill customers in advance for the firm's services.  SEC ADV Form Part 2, https://www.sec.gov/about/forms/formadv-part2.pdf (indicating procedures for advance billing).

Yellowstone would periodically refund amounts improperly billed to its customers' accounts.  The company's investors, however, were unaware that through the above process, Dave Hansen was effectively borrowing funds from their investment accounts.  Dave's spending continued, the liquidity crunches did not abate, and the misappropriation of client funds became more regular.  Yet, Dave somehow convinced himself that, so long as Yellowstone continued to increase the value of its clients' investment portfolios and he intended to return the money taken, his conduct wasn't that bad.  When customers occasionally realized that their accounts had been overbilled, Dave offered excuses for the improper charges, characterizing the fees as unintended errors, and returned the amounts taken.  Again, Dave deceived himself into believing that because he had repaid the amounts taken, his misappropriation of his clients' funds was somehow acceptable.[2]

In April 2016, Yellowstone's chief legal and operating officers, Michael Dustin and Paul Weimer, discovered significant overbilling in investor FC's accounts.  PSR, ¶ 21.  After further inquiry revealed overbilling in two other client accounts, they confronted the company's primary biller, Cameron High, and then Dave regarding the overages.  *See id.*  While Dave obviously knew Yellowstone had overbilled the accounts in question, he had not kept track of the quantity of those overbillings and did not know the amount the accounts were being billed that far in advance. When told, Dave was legitimately shocked.  The scope of the debt terrified him.  Yet, his initial reaction was not to contest the overages.  Rather, he owned them.  Unbeknownst to Dave, Michael Dustin recorded that meeting.  When told the overbilling of investor FC's accounts was in the millions, Dave said that debt would somehow be repaid:

---

[2]    Dave has, of course, now fully acknowledged that this conduct was both illegal and unethical.  *See* Ex. A, D. Hansen Letter.

Dave:     No, that needs to be done right. So, whatever we need to do to get it right….

\* \* \* \*

Well, I was shocked at the amounts obviously – whatever it takes, I guess, you know. If I have to sell every last thing to make it right, then we do that.[3]

Based on the scope of the overbilling that Dustin and Weimer had identified, it was immediately clear to Dave that the problem he had created was more significant than he had ever allowed himself to imagine.  Moreover, Dave knew that the overbilling went beyond the accounts that Dustin and Weimer had reviewed.  His unauthorized indebtedness was, in fact, much greater.

Dave's past, present and future were at an inflection point.  Dave could try and address the amounts identified by Dustin and Weimer and ignore the additional misappropriation that was then unknown, or he could act to try and right past wrongs and clean the slate.  Dave chose the latter, engaging outside counsel and accountants to help him to identify and quantify the full extent of his Yellowstone overbilling.  *See* PSR, ¶ 13.

Dave retained Philip Feigin, a securities law attorney at Lewis Roca Rothgerber Christie LLP who had served as Yellowstone's outside securities law counsel on a variety of issues over the years.   *See id.* Dave asked Feigin to investigate and account for all of Yellowstone's overbilling; he was going to repay it all.  *See id.*  This review would include not only the accounts of current clients but also the closed accounts of former clients.[4]  Mr. Feigen and his team were in Idaho Falls within days to begin that inquiry.  In his letter to the Court, Mr. Feigen describes the terms of this initial engagement.

---

    [3]    Ex. B, Dustin Recording Transcript 2 at 2:12-18; 26:24-27:2.

    [4]    This review of closed accounts identified roughly $400,000 in overbillings which was later reimbursed to those former clients. *See* Ex. C, Self-Report Letter, 7.

Dave agreed to retain us to conduct an independent investigation of what had gone on…. We set some important ground rules. If Yellowstone resisted production of any information we requested, we would terminate the engagement. If anyone at Yellowstone declined to be interviewed and [to] provide[] candid answers to our questions, we would terminate the engagement…. The goal was to self-report promptly to the Securities and Exchange Commission ("SEC") as soon as we had gathered, complied and analyzed what had gone on an could submit what we believed to be a competent report.[5]

As Mr. Feigin explained in his letter: "Dave and his staff cooperated in every way."[6]

Dave recognized the gravity of his position. He couldn't change the past, but he could try to correct his mistakes by refunding investors' overbilled fees as they were identified by Feigen and the accounting team. Dave took to this responsibility with conviction; it was for Dave a way to begin a process of redemption. To make clients whole, Dave needed time to sell various assets. Dave, however, did not want to delay. He planned to report Yellowstone's overbilling to the SEC. When he did so, he wanted to report that he had repaid the funds misappropriated.

Dave turned to Doyle Beck, a longtime mentor and friend.[7] Dave told Mr. Beck of Yellowstone's significant overbillings and asked for a bridge loan of $3 million so that he could refinance and/or sell the necessary assets to begin the process of repaying investors. *Id.* Mr. Beck agreed but required Dave to pledge his Yellowstone stock as collateral for the loan, which Dave did. *Id.* Dave would subsequently also refinance Yellowstone's existing lines of credit and borrow yet additional funds from Mr. Beck to obtain additional short-term capital to repay customers.[8] *Id.*

---

[5]   Ex D, P. Feigin Letter.

[6]   *Id.*

[7]   In his letter to the Court, Mr. Beck has described his relationship with Dave as follows: "Dave has been a dependable and responsible friend and business partner." *See* Ex. E, D. Beck Letter.

[8]   In their sentencing memo, the government suggests that Mr. Hansen borrowed and did not repay these funds. This is an inaccurate description which is addressed in Mr. Hansen's objections to the PSR, a copy of which is attached as Exhibit F and incorporated herein by reference. *See* Ex. F, D.E. 126 at 8-9, Hansen's Objections to Probation Officer's Presentence Investigation.

At the same time, Dave began the process of selling and/or pledging his most significant assets, including: his primary residence in Idaho Falls; a vacation home in Gilbert, Arizona; two Pilatus PC12 aircrafts; a Falcon 50 airplane; a commercial office building located in Idaho Falls; Yellowstone's office building; undeveloped commercial property in St. George, Utah; commercial office space in Boise, Idaho; a Skid Steer tractor; a Cadillac Escalade, and a Range Rover Sport. PSR, ¶ 24. Eventually, Dave signed over Yellowstone itself as a means to repay the financing provided by Mr. Beck. *Id.* In a matter of months, Dave sold off every significant asset he owned. As a result of his efforts, Dave raised well over $5 million in just a matter of months—funds that he used to repay clients as well as the short-term financing that had been used to reimburse the first tranche of investors.[9]

Dave's efforts went far beyond merely identifying and repaying the investors who had been intentionally overbilled; in retaining Phil Feigin and Lewis Roca, Dave committed to repaying clients whose accounts had been inadvertently misbilled as well. Yellowstone had billing issues beyond Dave's misappropriation. The company relied on outdated and inadequate billing practices prone to user error. The billing for the hundreds of millions that Yellowstone managed was calculated using simple Excel spreadsheet formulas that did not record historical amounts collected. *See* PSR, ¶ 16; Ex. C. As a result, the company's staff made frequent billing mistakes— some to its benefit and others to its detriment; *i.e.*, Yellowstone both overbilled and underbilled clients.[10] Yellowstone would periodically attempt to audit and correct these errors, but that process

---

[9]    PSR, ¶ 24. Dave also obtained and ultimately repaid expansion financing he obtained from Live Oak Bank. As explained in his Objections to the Probation Officer's Presentence Investigation Report, D.E. 126, Dave repaid the amounts of the *additional* short-term financing he obtained from Live Oak Bank in the fall of 2016. The amounts of Yellowstone's then existing lines of credit remain unpaid.

[10]    Ex. C, Self-Report Letter at 6.

US.128311917.03

was imprecise.[11]   As part of its inquiry, Roca oversaw a wholesale reevaluation of *all* of Yellowstone's account billing.   *Id.*   The results were surprising.

As a result of this 2016 audit, Yellowstone identified significant, systemic billing irregularities that exceeded Dave's expectations.[12]  Cameron High had inappropriately billed yet additional clients (both intentionally and unintentionally—in amounts both large and small), increasing Yellowstone's overall obligations.[13]   In its sentencing memorandum, "the Government acknowledges that part of the overbillings that occurred at Yellowstone were inadvertent."  D.E. 143 at 9.   In addition, Yellowstone discovered that High had also ***underbilled*** various client accounts.[14]   These cumulative amounts were themselves significant.   According to Mark Hashimoto, the forensic accountant later hired by Yellowstone to evaluate its billing history, Yellowstone had underbilled 93 accounts a cumulative $1,867,374.[15] Unbilled receivables would have been exceedingly meaningful to Yellowstone at the time.   The company was trying to compensate the numerous clients whose accounts had been overbilled.   Charging clients for underbilled amounts would have helped balance Yellowstone's books.   Yet, Dave made the decision not to charge the underbilled accounts for the aged receivables owed.  *Id.*at 6.  Dave had engaged Lewis Roca to account for the amounts overbilled.  He chose not to transform that process

---

[11]   Dave Hansen was aware of this haphazard billing and, admittedly, he had failed to correct it because Yellowstone's billing weaknesses allowed him the flexibility to access client funds when necessary.

[12]   *See* Ex. C, Self-Report Letter at 5-6.

[13]   *Id.*

[14]   *See id.*

[15]   A spreadsheet created by Mark Hashimoto identifying and totaling all of Yellowstone's underbilled accounts is attached hereto as Exhibit G.  A copy of Mark Hashimoto's *curriculum vitae* is attached as Exhibit 1 to Mr. Hansen's Statement on Restitution.  *See* D.E. 127, Ex. 1.

as a collection effort, charging other customers for the company's mistakes. Yellowstone ultimately wrote off those underbillings. *See id.* at 6.

At the conclusion of Lewis Roca's inquiry, Yellowstone, at Dave Hansen's direction, reported its overbilling to the SEC in a July 29, 2016 self-disclosure letter. *See* Ex. C, Self-Report Letter at 1. Although the self-report offered certain justifications, the first paragraph of that letter candidly acknowledged that Yellowstone had engaged in "possible violations of the Investment Advisers Act of 1940 and its related rules." *Id.* It further disclosed that Yellowstone had billed over a third of its home office accountholders their 1% annual fee more than once in the same year. *Id.* at 5. The letter admitted that Yellowstone had charged "advances" to its clients to meet the firm's payroll and "other expenses." *Id.* And, the disclosure acknowledged that "[b]y April 2016, some '8072' clients had been billed annual fees for multiple years in advance." *Id.* Yellowstone disclosed the cumulative impact of these errors, reporting that the company had already reimbursed clients $4,495,782.62 and that it anticipated needing an additional $785,802.84 to reimburse additional investors. *Id.* at 7. In short, Dave did what remarkably few individuals in similar circumstances have done—he repaid the many victims of his conduct *before* he was aware of any criminal inquiry into his conduct and at the same time reported his conduct to enforcement regulators. In fact, as tacitly acknowledged in the government's sentencing memorandum, Dave repaid not only those investors he had intentionally overbilled, but the Yellowstone customers who had been mistakenly overbilled as well. *See* D.E. 143 at 9 ("[T]he Government acknowledges that part of the overbillings that occurred at Yellowstone were inadvertent.").

## III.   Dave Hansen's Broader Character and History

The government's sentencing memorandum focuses on various examples of Dave's excesses—spending that prosecutors would like to present as emblematic of Dave's values. That spending, which was beyond Dave's means, stands in contrast to other instances of modesty,

dignity and responsibility that have permeated Dave's life and that are reflected in the scores of letters provided to the Court from Dave's family, friends, colleagues, clients, fellow congregants and others.   Those letters depict an honorable, caring person far-removed from simplistic characterizations of greed and deceit reflected in the government's list of luxury items.   Rather, they reveal a loving and devoted husband, father and friend, a passionate and engaged church congregant, a committed and active community member, a steadfast neighbor and a man committed to the charitable support of others.   The broader examination of Dave's personal background makes clear that, in fact, "Dave's problems are [a] very small part of who David Henry Hansen really is."[16]

Stories of Dave's quiet generosity of time and spirit repeat as a theme throughout the letters presented on his behalf.   That is because those acts of altruism—both monetary and in-kind; at times grandiose, often small and subtle—beat as a strong and consistent pulse through the story of his life.   As Dave's long-standing friend, Bret Westerberg, wrote:

> Dave's most distinguishing feature [w]as his desire to serve those around him, particularly, those less fortunate.   On a micro-service-level, Dave was always the first person to raise his hand in aid when someone was injured, an elderly would pass, or an accident would leave someone in the hospital.   Dave Hansen involved himself in any service project that he was aware of.[17]

Lance Mergens, a friend from their time as missionaries over 30 years ago, writes: "Over the years working with Dave, I never have seen him serve for the praise of others but on the contrary, his work was done in ways so that others would not see."[18]

---

[16]   Ex. E, Letter of D. Beck.

[17]   Ex. H, B. Westerberg Letter.

[18]   Ex. I, L. Mergens Letter.

US.128311917.03

**A.      Dave's Extraordinary History of Philanthropy and Community Involvement**

Dave's commitment to service began at a young age.  Like many, after high school, Dave volunteered to serve on an LDS mission.  Dave was assigned to serve in the Republic of Haiti. One of the poorest countries in the Americas and most populous countries in the Caribbean, Haiti was a stark change from Rexburg, Idaho.[19]  Dave, however, threw himself into the mission and he quickly developed a strong connection to Haiti's people, their culture and spirit.  This mission proved to be a defining experience in his life.

When, on January 12, 2010, a catastrophic earthquake decimated Haiti, it also shook Dave's soul.  An estimated three million people were directly affected by the quake that killed hundreds of thousands of people and destroyed much of the country's physical infrastructure.[20] Dave was heartbroken by the news reports of the immense, immediate suffering throughout Haiti and quickly moved into action.  Dave did not simply open his checkbook; he organized and led an emergency relief mission to one of the country's affected areas to provide personal support to the place he once called home.

Dave recruited both family and friends to fly with him to the Dominican Republic, drive across the country to Haiti's western shore where he and his team of 11 volunteered to help in any way they could.  This mission to Haiti was not glamping.  Dave and his team were in Haiti within a month of the quake.  For two weeks, they spent long days moving bricks and swinging hammers in an effort to help rebuild lives.  At night they slept in tents or on floors, only to wake up the next

---

[19]   *See* Wikipedia, Haiti, https://en.wikipedia.org/wiki/Haiti#cite_note-:0-281 (last visited June 8, 2020).

[20]   CBC News, *Special Report—Haiti Earthquake* (Jan 05, 2012), https://www.cbc.ca/news/ world/special-report-haiti-earthquake-1.1137266.

US.128311917.03

day to start again. [21]  Harold Jules, the former stake president of the Croix-des-missions stake of the LDS church in Port-au-Prince and current Mission President of the Haiti Port-au-Prince mission writes that, following the quake, he had a vision that angels would come to Haiti to help save its desperate people from the destruction.[22] "I am convinced that Dave was one of the angels."[23] According to Jules, "I think that there were almost 30 people who were able to return to their homes as a result of [Dave and his team's relief efforts] at that time."[24]  It was a true rescue mission.

Dave's commitment to Haiti was not fleeting.  He remained dedicated to the country and its people as they struggled towards recovery.  Over the years that followed, Dave made numerous return trips to volunteer his hand in addressing Haiti's staggering needs.  It is worth emphasizing the purpose of these trips.  These were not fact-finding or oversight missions.  Dave was not in Haiti to direct or donate.  He was there to work.  Dave and the men and women who accompanied him on many trips were there to assist in the necessary "extensive manual labor."[25]  As Travis Gugelman described it, "Dave was one of the first to jump in and do the hard labor (hauling out the junk, lifting and laying masonry block, and painting)."[26]

---

[21]  Photographs from the group's relief trip are attached hereto as Ex. J.

[22]  *See* Ex. K, H. Jules Letter.

[23]  *Id.*

[24]  *Id.*

[25]  *See* Ex. L, T. Gugelman Letter.

[26]  Dave insisted that his son, Austin, accompany them on one of those trips. *Id.* As it did for Dave, Haiti made an impression on Austin who spent over 50 hours on his final high school senior project collecting over 750 pairs of shoes for those in need in developing countries.  *Id.* Additionally, Austin collected hygiene kits for Haitians in need as part of his Eagle Scout project.

US.128311917.03

Of true meaning and import, beginning in March 2014, Dave began to focus his support and aide on the Foyer Coin Des Cieux-Orphelinat[27] orphanage in Saint-Marc, Haiti.[28]  According to Fritzner Morlant, the orphanage's chairman and director, before Dave's involvement, the orphanage, which then housed about 15 children, was near collapse.  Dave, who was back in Haiti with another organized mission, saw the orphanage's need and offered to help.[29]

Back in Idaho, Dave began to organize his own community to support the orphanage.  They began with clothing drives, then food, and with the continued further support from Dave and the people of Idaho Falls, the orphanage was not only able to stabilize its operations, but expand the services it provided to scores of desperate children.  With Dave's guidance and the communal effort of the team he led, the Foyer Coin Des Cieux-Orphelinat orphanage was able to house and educate close to 100 children and to provide an education to dozens of additional children who lived in the surrounding neighborhoods.[30]  In December 2014, Dave returned to Haiti yet again, this time with the entire Hansen family.  While other families spent Christmas at the beach or at ski resorts, the Hansens worked to help the people of a small west Haitian town.  As Fritzner Morlant wrote in his letter to the Court:

> Certainly[,] Dave's effort has significantly impacted the lives of these children and saved them both figuratively and in many cases, his efforts have literally saved lives….  His influence here has forever changed the lives of so many and I am so grateful to [have] met him.[31]

---

[27]   *Id.*

[28]   *See* Ex. M, F. Morlant Letter.

[29]   *Id.*

[30]   *Id.*

[31]   Ex. M, F. Morlant Letter.

Dave has continued to donate his time and effort to the developing world even as he has addressed the allegations in this case.  In particular, Dave has used his knowledge of finance and his entrepreneurial planning skills to assist his friend, Dal Zemp, to found the Legacy Giving Fund—an investment fund designed to aid the poor by building hospitals and schools in developing nations.[32]  Dave worked as an advisor and director for the fund's humanitarian efforts. According to Zemp, the fund is already making an impact by working to build a burn center in Itihara, Nepal and a high school for the BlinkNow orphanage in Surkhet, Nepal.[33]

The letters presented to the Court also reflect the number of ways in which Dave has consistently contributed to his own community in East Idaho.  A poignant example of Dave's character is reflected in the tragic story of Patrick and Ashley Sullenger.  In July of 2010, the Sullenger's 18-month-old daughter, Preslee, accidentally fell into a canal and was carried by its current over a mile downstream.  Preslee was rushed to Idaho Falls for care, where a team of doctors worked tirelessly to save her life.  When, after concerted effort, Preslee's heart began to beat again, the physicians in Idaho Falls decided to life flight Preslee to the Primary Children's Hospital in Salt Lake City, Utah.[34]

Late that night, Ashley Sullenger's aunt, Cindy Erikson, called Dave to explain what had happened to her grandniece and to ask for Dave's assistance.[35]  Dave did not know the Sullengers; they had never met.  Yet, at 2:00 a.m., Dave met the Sullengers at the Idaho Falls airport, from

---

[32]   *See* Ex. N, D. Zemp Letter.

[33]   *See id.* Another friend, Jeff Ybarguen, explains how the fund has also built homes for the impoverished in these developing areas.  Ex. O Letter of J. Ybarguen.

[34]   *See* Exs. P and Q, W. Patrick and Ashley Sullenger Letters.

[35]   *See* Ex. R, C. Erikson Letter.

US.128311917.03

where he flew them to Salt Lake City so that they could immediately be by their daughter's side.[36] Dave slept in the SLC airport that night, only to fly back to Idaho Falls the next morning so that he could join his own family for a planned vacation.  Later that week, as Preslee continued to fight for her life, Dave began flying other members of the Sullengers' extended family and friends to Salt Lake to be by Patrick and Ashley's side.  In his letter to the Court, Patrick Sullenger wrote about those heartbreaking days of July 2010: "I am so grateful for Dave and his generosity, willingness, and compassion during the hardest time of my life.  I believe it shows a lot about a person's character when they are willing to do something for someone they have never met."[37]

These more dramatic examples of Dave's charitable efforts are accompanied by numerous everyday examples of community involvement and charitable support.  The letters provided to the Court allude to Dave's history of additional quiet acts of charity: the anonymous Christmas gifts for struggling families; support for parents temporarily out of work; mentoring young adults looking for career advice and serving as a confident for friends needing guidance and support. Dave led a local boy scout troop.  He and his wife Tori briefly cared for a 2 year-old child of friends when the baby's mother became critically ill.[38]  He offered his skills as a pilot to provide "angel flights," transporting those in need to hospital appointments or delivering the deceased to a distant home for burial.[39]  He supported local law enforcement by flying police officers over suspected marijuana grows, aiding in search and rescue efforts and donating time and support to the local police department's charitable endeavors.  As Bruce Bowler, a retired Captain with the

---

[36]   Ex. Q, A. Sullenger Letter.

[37]   Ex. P, W. Patrick Sullenger Letter; *see also* Ex. Q, A. Sullenger Letter ("Dave's kindness has made a huge impact in our lives and we will always be grateful for the extra time he gave us with our daughter before she passed away.").

[38]   Ex. S, T. Olson Letter.

[39]   Ex. E, D. Beck Letter.

Madison County Sherriff's Department, put it: "It was comforting to know that we could call upon [Dave] if needed."[40]

The letters offered to the Court reference yet other examples of Dave's philanthropic and altruistic acts: providing physical refuge for a sister-in-law and her children who were subjected to domestic abuse; volunteering to feed the homeless; visiting the elderly (often with treats or flowers in hand); helping a neighbor's wife pull up old carpet and hauling away the refuse, and assisting a neighbor shortly after his release from kidnappers in Mexico.[41]

Some of the individuals who have known Dave longest have recognized and wrote about these ingrained traits. Dave's lifelong friend, Russell Robison, described Dave as "someone that neighbors turn to for help when needed and he offers with a glee in his step and never asks for anything in return."[42] Dave's friend, Jeff Ybarguen, described it: "Many of us have desires to help others; Dave sets the example by putting these desires into action" and "[w]henever a member of our neighborhood or community was in need, Dave would be one of the first ones to roll up his sleeves and go to work to help them."[43] His neighbor of 10 years, Geyron Zaugg, wrote of how Dave was "always serving others in the neighborhood, in our church, and in our community."[44] Dave's sister-in-law, Staci Chavez wrote: "If Dave sees a need, he is on the frontlines assisting and helping, he is very charitable and an upstanding member of his community."[45] Dave's friend Tyler Lyman described how Dave has even used his current situation as a means to support others:

---

[40] Ex. T, B. Bowler Letter.

[41] Exs. U and V, Letters of Michael D. Griffin, Robert Meek.

[42] Ex. W, R. Robison Letter.

[43] Ex. O, J. Ybarguen Letter.

[44] Ex. X, G. Zaugg Letter.

[45] Ex. Y, S. Chavez Letter.

"Dave was always willing to listen without guile, providing support without shame. He was honest and authentic which is a rare quality in a person and friend.  He was willing to open up about his own challenges and showed tremendous empathy for me." [46]  Family friend Ryley Shaum has explained that following the tragic, unexpected passing of his own father, "Dave has stepped in to take that place.  He gives me a shoulder to lean on. Even with his life-changing events happening, Dave puts all of that aside and is there for me…." [47] Finally, in his own letter to the Court, Dave acknowledged that while the collapse of Yellowstone distracted him from philanthropic activity and community participation, he has rekindled that commitment since moving to Arizona, where Dave now takes time to feed the homeless and write inmates residing in the state penitentiary. [48]

Dave's philanthropic acts are emblematic of the type of unique and extraordinary charitable conduct that courts have held justify guideline variances. [49]  Dave did not act to increase his civic exposure or to support future business endeavors.  His charitable work was not performed at black tie events or among board room suits.  Rather, as his actions reflect, Dave worked out of a pure altruistic desire to serve individuals in the greatest need of his help.

---

[46]   Ex. Z, T. Lyman Letter.

[47]   Ex. AA, R. Jaxon Shaum Letter.

[48]   *See* Ex. A, D. Hansen Letter.

[49]   *See e.g.*, *United States v. Canova*, 412 F.3d 331 (2d Cir. 2005) (affirming a downward departure for a  former Marine who, as a volunteer firefighter, had attempted to rescue a child from a burning building, delivered three babies, and administered CPR to various persons in distress); *United States v. Huber*, 462 F.3d 945 (8th Cir. 2006) (affirming a downward departure for a defendant who had loaned money to neighbors and fellow farmers in need, saving farms from foreclosure); *United States v. Cooper*, 394 F.3d 172 (3d Cir. 2005) (allowing a downward departure for community service that was "hands-on" and likely had a dramatic and positive impact on the lives of others); *United States v. Taffaro*, 919 F.3d 947 (5th Cir. 2019) (affirming  sentence of probation based on defendant's charitable activity, prior law enforcement and military service and age).

US.128311917.03

*United States v. Ty Warner*, 792 F.3d 847 (7th Cir. 2015) is instructive.  In *Warner*, the Seventh Circuit upheld a district court's sentence of two years' probation for a defendant (the CEO, sole owner and founder of Ty Inc., the company that manufactures Beanie Babies) who pled guilty to a scheme to hide $107 million in taxable assets offshore, resulting in a tax loss of $5.6 million.  *Id.* at 864.  Based on the scope of his fraud, the defendant qualified for an advisory sentencing guideline range of 46 to 57 months' imprisonment.  *Id.* at 852.  However, based on Warner's charitable work, the court demurred from the guidelines, and imposed the probationary sentence. *Id.*  The district court explained that Warner's "private acts of kindness, generosity and benevolence" were the primary reasons for the its substantial variance.[50]

On appeal, the government argued that the district court's reliance on the defendant's generosity—which consisted primarily of writing checks and donating excess toy inventory—was misplaced. *Id.* at 858. The Seventh Circuit disagreed. The appellate court acknowledged that the amount of money donated did not itself warrant a variance, but, rather, what the defendant's history of service and philanthropy revealed of his personal character that justified the district court's sentencing decision.  *Id.*

In comparison, Dave's charitable efforts are even more impressive than those of Warner's. Dave did not simply write checks to support those in Haiti or other parts of the developing world. After the earthquake, Dave travelled to Haiti four times to join local residents in the hard labor of physically rebuilding a devasted community.  Back home, he further led a community to personally contribute their hearts, time, belongings, and, yes, money to help a far-away people with whom they had no direct connection.  Dave's altruistic efforts, most notably to support the people of Haiti

---

[50]   *United States v. Warner*, Case No. 13 CR 731 (N.D. Ill. Jan. 14, 2014); Sentencing Hearing Trans. at 50-51 (stating that it would be "unjust" to ignore that Warner's charitable contributions had "trump[ed] all of the ill-will and misconduct he engaged in.").

US.128311917.03

but also in his own community, were extraordinary not only in scope, but impact and reflective of a character that warrants a variance from the guidelines.

## B.   Dave's Unwavering Support of Family

Dave's charitable efforts to others is complemented by his admirable history of quiet support for his family, friends and community.  Like his charitable work, Dave's support of family and community repeat as a theme throughout the letters presented to the Court.  As Jennifer Erikson succinctly described it: "Dave has always been true to his family and friends."[51]

To know Dave, it is important to understand his roots in Eastern Idaho.  Dave is the oldest son of Robert and Louise Hansen.  PSR, ¶ 81.  Dave has two older and one younger sister along with two younger brothers.  *Id.*  The family lived on a small 50-acre farm in Rexberg, Idaho.  *See Id.* at ¶ 82.  Robert Hansen's primary occupation was insurance sales and Louise was a teacher. *Id.* at ¶ 81.  Yet, the Hansens maintained the family's farm as a going concern in part as a means to engage the Hansen kids in the family's support and livelihood.  *Id.* at ¶¶ 82-83.  As the oldest son, Dave had primary responsibility for many of the farm's physical requirements.  Dave would tend to both livestock and crops before and after school.  Dave did not like farm work, but he learned of the honor and value in the hard labor and the collective effort it required.

Although the farm served as a backdrop, much of the ethical and moral ethos for Dave's upbringing was derived from the Hansen family's strong religious affiliation.  Dave's parents were observant Mormons who instilled the Church's teachings in Dave and his siblings.  They demanded much of their children, and especially Dave, who was expected to serve as a leader to

---

[51]   Ex. BB, J. Erikson Letter.

his siblings and in the church. [52]  It was these familial Church lessons of community and service that have inspired Dave for much of his life.

The love and support that Dave has shared with his wife, Tori, and their children stands as the third defining pillar of Dave's character.  Following his mission, Dave returned to Rexburg where he enrolled in Ricks College where he met Tori, whom he married in 1993.[53]  Dave and Tori have raised four wonderful children.  Those who have known Dave longest speak eloquently of Dave's commitment to his family.[54]  That commitment to family has never wavered, even under the stress of the last four years.[55]

In addition to caring for his own family, Dave has played a critical role in supporting his parents and siblings.  There are numerous letters reflecting Dave's unfaltering commitment to his broader family—letters reflecting a love, devotion and non-judgmental support of this extended, yet close and caring family.  For example, in her letter to the Court, Dave's sister, Heidi, writes

---

[52]  *See* Ex. A, D. Hansen Letter.

[53]  In her letter to the Court, Tori explains what drew her to Dave—"He had a great sense of humor, was very tender-hearted, and had high values and morals." *See* Ex. CC, T. Hansen Letter.

[54]  Despite the busy work schedule that he has kept, Joshua Manwaring notes how Dave never seemed to miss any of the extracurricular school events in which his daughter participated.  *See* Ex. EE, Joshua. Manwaring Letter.  Jeff Ybarguen writes that, having watched Dave, he wanted "to emulate him as husband and father."  Ex. O, J. Ybarguen Letter.  David Chavez referred to Dave's relationship with his children as "an impressing glimpse and strangely powerful example of a relationship that I desired with my future children."  Ex. FF, D. Chavez Letter.  Zack Hackett wrote that Dave has "taught me by example how to be a great husband, respected father, admired son in law and valued contributing member of society."  Ex. GG, Z. Hackett Letter.  Finally, in her letter to the Court, Tori marvels at the support and guidance that Dave has always been able to provide their children. "He is a constant support and cheer leader for our children and for me." Ex. CC, T. Hansen Letter.

[55]  Brad Erikson, Dave's friend of thirty-four years, wrote that he has "witnessed first hand how [Dave] continues to treat his wife and children … with kindness and respect … behavior [that] has never changed."  Ex. HH, B. Erikson Letter.  According to Erikson, "[Dave] has always been thoughtful and considerate and amid the stress… Dave has become an even better father and husband with an emphasis on spending quality time with [his family]."  *Id.*

about the "countless acts of service David has performed for my parents, friends and other family."[56]  Even as Dave was adjusting to the loss of Yellowstone and mounting pressures of a government investigation and prosecution, he continued to quietly mentor and support her son who was looking for career direction and guidance.[57]  Dave's brother, Aaron, has also written the Court about how Dave supported him through his years of substance abuse.  "He has given me so many opportunities in my life that very few would have given me."[58]  Dave's mother has written of a trying time when he came to comfort her.  Thinking of that moment, Louise Hansen wrote: "He will never know how this experience healed me and gave me peace to carry on."[59]

**C.      Dave's Civic Commitment and Support of Community**

Dave has provided this same type of committed support to his many friends and the Idaho Falls community over the years.  Individuals who have written the Court have provided vivid examples of how Dave stood beside them when they were most challenged.  In his letter, Jeremy Manwaring wrote that "[i]t was Dave's encouragement and counsel that gave me the courage to face my problems and get help" when struggling with substance abuse.[60]  Larry Heiser explained how it was Dave Hansen who escorted him to a rehab facility in Salt Lake City when he also needed help.  Dave's support didn't end at the facility's door: "Once I was in rehab, Dave checked on me and had my back when my partner at that time tried to run me out of my business." [61]  When Bret Westerberg was diagnosed with lymphatic cancer, Dave became his "one-man system of

---

[56]   Ex. II, H. Carter Letter.

[57]   *Id.*

[58]   Ex. JJ, Aaron Hansen Letter.

[59]   *See* Ex. LL, Louise Hansen Letter.

[60]   Ex. MM, Jeremy Manwaring.

[61]   Ex. NN, L. Heiser Letter.

support and encouragement."[62]  When Larry Heiser's wife needed emergency medical attention, Dave arranged for her care and then flew her from Billings, Montana to a specialist in Idaho Falls. Heiser credits Dave with actually saving his wife's life.[63]

The story of Dave's relationship with Devin Shaum is especially telling.  Shaum, a church leader who mentored Dave when he was young, spent a significant portion of his life battling the dual afflictions of multiple sclerosis and depression.[64]  In 2016, Shaum sought a medically required retirement, that, unfortunately, led to a legal dispute with his insurance providers.  Although Dave was then addressing his own avalanche of challenges at Yellowstone, he was able to compartmentalize his own financial and legal difficulties and devote a significant part of himself to assisting his friend.[65]  As Shaum's son Hayden wrote: "Dave worked on his nights and weekends to help my family fight this unjust play against my father…. [H]e was a voice of reason when my dad didn't want to listen to anyone else."  Put simply, "[h]e was a stubborn friend…."[66]

As noted above, Dave Hansen's life has been committed to not only his family and friends, but also to his community of faith.  The letters provided to the Court reflect the depth, longevity and commitment of Dave's ecclesial convictions.  Dave has been actively involved in the Church since his youth.  He has continued to support the Church and its community throughout his adult life, serving as a member of a church's Stake High Council, a member of the Bishopric, a home

---

[62]   Ex. H, B. Westerberg Letter. (Dave also made time for Westerberg's parents, checking in on the them multiple times a week so that Bret Westerberg could focus on his own recovery).

[63]   Ex. NN, L. Heiser Letter.

[64]   Ex. OO, H. Shaum Letter.

[65]   *Id.*

[66]   *Id.*; *see also* Ex. AA, R. Jaxon Shaum Letter ("When [Devin Shaum] seemed to be losing the battle, Dave was willing and able to help….  He was ready to bow my father up and be that person in his corner to help and encourage him to keep fighting and let him know that he was a person worth fighting for.").

teacher, ministering partner, youth leader and adult educator.[67]  Dave's friend and former neighbor,

Jeremy Dresen, notes how "Dave has served selflessly in [these] several callings over the years."[68]

One of Dave's ecclesiastic leaders, Doug Jenson, wrote:

> Dave and I have spent many hours working with members in our ward and in the
> community, and I have been able to see the impact that Dave has made on the lives
> of many people; I've been amazed to watch his kindhearted, empathetic
> interactions.  He's will to do whatever is necessary to lift the load of others.[69]

Not surprisingly, Dave has allowed his faith to help guide him through the challenges he

faces now.  In her letter to the Court, Dave's mother wrote about how the Church has helped guide

Dave from his errors and through these proceedings.

> It was during this early time that Dave was called to the high council in his stake.
> What a blessing[].  His testimony was wavering and this tender mercy brought the
> spirit more fully into his life.  As he spoke in many meetings, he gave talks of hope
> and peace.  He expressed his love for the Savior in helping him to repent and move
> forward in his life.[70]

Yet, at the same time, Dave has used the challenges of his criminal prosecution to strengthen

further his faith.  Dave has spoken of his own failings with fellow congregants.  According to

Geyron Zaugg: "His deep humility and sorrow was expressed in church one Sunday and the lessons

that were learned and the trials and challenges brought upon him and his family during this time

were felt by all that were involved."[71]

### D.    Dave's Acceptance of Responsibility and Personal Transformation

Dave Hansen has now been convicted of fraud.  That is a fact that often creates a chasm

between a defendant and his friends, community and, at times, family.  Not so here.  Although

---

[67]  *See e.g.*, Ex. PP, D. Jenson Letter.

[68]  Ex. QQ, J. Dresen Letter.

[69]  Ex. PP, D. Jenson Letter.

[70]  Ex. LL, L. Hansen Letter

[71]  Ex. X, G. Zaugg Letter.

recognizing that Dave has made grave mistakes, Dave remains close to his family and community of friends as reflected in the numerous letters submitted to the Court.

Yet, Dave candidly admits that despite his best efforts, he has been unable to protect those around him, and, in particular, his family, from the blowback of his Yellowstone mistakes.  Putting the economic impact aside, Dave has altered the goals and aspirations of his family and, by mere association, forced them to bear the "brunt of gossip and callousness."[72]  His son Austin transferred universities to be closer to home to work as an apprentice to Dave in his new business so that the company will endure if and when Dave is required to report to prison.  While Dave and Tori have always insisted that their children be employed, "the kids now have had to support themselves more fully."[73]  In her letter to the Court, family friend Jennifer Erikson wrote:

> I am convinced that Dave is ashamed and despondent for whatever role he might have or might not have played in this. I am also confident that his family has suffered intensely and will continue to pay penalties throughout their lives.  I am particularly proud that Dave has remained true to his family and commitments throughout this anxious time.  Dave and Tori remain outwardly calm, loving, and involved with their children, teaching them that family truly is the most important institution.[74]

Even through these hardships, Dave's children have continued to learn the importance of family.  Austin Hansen has written about how Dave has "focused on spending time with family."[75]  Dave's daughter, Lauren, notes that Dave calls her every day, and is "is the only one, 700 miles

---

[72] *See* Ex. BB, J. Erikson Letter.

[73] *Id.*

[74] *Id.*

[75] Ex. RR, Austin Hansen Letter.

US.128311917.03

away, that wants to know how my day was and what I did."[76]  According to Hailey Hansen, the family has "never been closer."[77]

Most importantly, the letters provided to the Court reflect Dave's own recognition of how his poor choices unfairly impacted those he loves.  Dave has not shied away from his failings and has never forgotten that his family is of paramount importance.  Over the last four years, Tori has learned of what Dave did at Yellowstone.  Aware of those errors and the collateral toll they have imposed on her and the Hansen kids, Tori writes: "Today, I am grateful that I made the decision to marry Dave Hansen," because of the better person that she knows he has been and will be.[78]  In her letter, Hailey Hansen wrote:

> I cannot explain how sorrowful my dad has been when he explained to us how our lives were going to change after this all began… he sat us all down and ensured us that he would make it right.  He told us that he would do whatever it takes to make sure no one was owed any money and how sorry he was that we would have to go through everything that was about to come.[79]

Observing this all from the outside, Dave's 20-year friend and former colleague Art McCracken wrote elegantly of Dave's transformation:

> Mr. Hansen is cognizant of the present circumstance but more importantly, committed to do what it takes to honor those he serves.  I can hear a gentleness in his voice that hasn't always been there.  I can hear an openness to responsibility and impact that is outward and not inward.  I see his focus on eternal principles rather than mortal wanderings.  I see someone who understands that simplicity and peace is found in the real and not the perceived.[80]

Cindy Erikson, whose family Dave overbilled, has also identified this change: "We watched as Dave lost or sold pretty much everything he had, except his family and close friends.  It had to be

---

[76]   Ex. SS, L. Hansen Letter.

[77]   Ex. TT, H. Hansen Letter.

[78]   Ex. CC, T. Hansen Letter.

[79]   Ex. TT, H. Hansen Letter.

[80]   Ex. UU, A. McKracken.

a very dark time in his life, and still is hard, but I've seen a change in him the last year and I like the change."[81]

### E.   Dave's Professional Transformation

Finally, one cannot talk about Dave without also acknowledging his professional endeavors.  Although Yellowstone ultimately could not survive the proliferating injury caused by his mistakes, the company had been a remarkable East Idaho success story for which Dave deserves great credit.  As noted previously, when Dave opened Yellowstone in 2004, he did so with two junior employees.  A decade later, Yellowstone directly employed 21 individuals; the company worked closely with eleven additional outside independent advisors located in nine separate locations.  The company had grown from less than 100 accounts to over 3,000 accounts valued at over $960 million.  That growth and success was the result of Dave's vision and drive.

And, while Dave had dreams of growing an Idaho Falls-based Yellowstone into a national presence, he continued to run the company like the small, close-knit familial operation he so enjoyed.  Dave did not look for industry specialists or seek to move Yellowstone's operations as the company grew.  Dave hired friends, relatives and Idaho Falls residents who had never before worked in the financial services industry.  He trained and promoted them, even as the positions in which they served grew past them.  Dave was immensely proud of Yellowstone's staff, their devotion to the company and its investors.  Dave recognizes that when he ultimately lost Yellowstone, he did so not only for himself, but everyone.

Too often a man's mistakes take hold and, like a cancer, metastasize throughout his character to ultimately define his place in the world.  That descent is readily identifiable in so many defendants.  Despite his significant efforts in the summer of 2016 to right past wrongs, it appeared

---

[81]   *See* Ex. R, C. Erikson Letter.

for a period of time that Dave Hansen would be no different.  After losing his business, career, the home he had provided for his family and all the material representations of his years of work, facing the daunting prospect of significant debt, a felony brand and resulting incarceration, and saddled with the knowledge that he had hurt and disappointed so many, Dave began to slide.  Yet, somewhere along the way, the pillars of Dave's life—faith, family, community—took hold.  With the core values that Dave learned from his parents, the principles of faith and direction of purpose that Dave learned at church, and supported by the love of Tori, their children and community, Dave again began to find his way.  Since then, "[t]hrough the countless nights of sleeplessness, the panic, uncertainty, stress, trauma, [and] emotional toll" Dave "has managed to carry all while not giving up."[82]

Dave's ability to restart and redefine himself while the subject of the government's prolonged inquiry is again reflective or his true character.  While the loss of Yellowstone was heartbreaking for Dave and his *de facto* inability to work as a securities advisor daunting, Dave found another way to be a productive member of society.  After a few months in the wilderness, Dave put his head down and started over.  The Hansens moved to Arizona in order to begin anew.  He threw himself into a new business venture and, with determination, has created something new—an aircraft parts brokerage firm that can provide for the now more modest expectations of himself and his family and, in the not-too-distant future—his creditors.  Dave Hansen has dug a significant hole for himself, but in the years since Yellowstone, he has shown he has the perseverance to climb out of it.  Making his creditors—including, especially, Victim J.D.—whole is the first step in that process.  Dave is determined to make that happen.

---

[82]   Ex. Y, S. Chavez Letter.

**IV.    The Sentence Requested By The Government Is More Than Minimally Necessary and Would Not Be a "Just Punishment."**

Section 3553(a) provides that the sentence imposed should provide a "just punishment for the offense" of conviction.  Here, such a sentence is clearly below the otherwise applicable guideline range.  Yet, the government and probation officer recommend that the Court impose a sentence at the high end of that range because Mr. Hansen acted "out of pure greed."  *See* D.E. 143 at 2.  Such an evaluation of this case is both overly simplistic and legally erroneous. Sentencing based on this premise alone would result in significant injustice.

To start, the assertion that a "high end" sentence is appropriate in light of the defendant's greed erroneously simplifies the nature and application of the guidelines themselves.  Regrettably, greed is the primary motivating incentive underlying most white collar fraud cases.  There are few benevolent fraud schemes with modern day Robin Hoods at their helm.  Rather, greed underlies the overwhelming majority of such cases.  Yet, under the government's logic, all of those cases would need to be sentenced at the high end of the otherwise applicable guideline range.  There would, in fact, be no range for fraud prosecutions, just high-end sentences.  Section 3553(a) demands a more thoughtful approach.

A significant portion of the government's brief addresses alleged trends in white collar sentencing and the need to hold the guideline line to provide just punishment, promote respect for the law and/or maintain deterrence.  D.E. 143 at 21-25.  These arguments largely ignore the defendant in the instant case.  Despite the government's suggestion, sentencing is not about adhering to or correcting statistical means.  Sentencing is the most personalized task a federal district court judge has.  Section 3553(a) requires the Court to evaluate Mr. Hansen and his case alone in determining the sentence he should serve.

The Court needs to ask what punishment is called for by all of the conduct at issue in *this case* and the entirety of the person to be sentenced now—*i.e.*, Mr. Hansen—looking to the guidelines only as an advisory suggestion and not a bounded range.[83]  Such an assessment must account for Dave Hansen's extraordinary efforts to address and correct his actions in the summer of 2016.  That remediative conduct—which is largely ignored by the government—must be accounted for.

- Dave engaged independent outside counsel to identify, quantify and report the extent of his intentional malfeasance;

- He ordered an accounting that would further identify *all* amounts overbilled to Yellowstone clients;

- Dave directed the implementation of a one-sided accounting procedure for all billing errors (*i.e., intentional and unintentional*), thereby foregoing in legitimately underbilled earned fees;

- Dave sold his home, businesses, investment property, capital investments, and all of his high value assets to acquire the funds to repay victims; and

- Dave self-reported his unlawful conduct to the U.S. Securities and Exchange Commission.

In his letter to the Court, the counsel that oversaw Yellowstone's internal investigation and SEC self-referral, Phillip Feigin, wrote:

> I have been asked on any number of occasions to write letters such as this on behalf of people facing judgment but have agreed to do so only rarely.  I do so now because I believe [Dave] to be of exemplary character, a man who took responsibility for his mistakes and took it upon himself to make the very best of a very bad situation, more so than anyone else under such circumstances, in my long experience.  To me that means and should mean a great deal.[84]

This Court is undoubtedly aware of the accurate wisdom of Mr. Feigin's assessment.  Mr. Hansen's significant compensatory efforts are an anomaly.  In the typical investor fraud case, the Court

---

[83]  *See Gall*, 552 U.S. at 46.

[84]  Ex. D, Phillip Feigin Letter.

US.128311917.03

would be presented multiple seizure warrants and the claims of scores of victims financially ruined by the defendant's fraud. Despite the scope, breadth and length of the scheme outlined by the government, restitution of less than $1 million remains due to *a single victim*. What's more, if Mr. Hansen had directed Yellowstone to bill those clients whose accounts had been underbilled, that victim would now be fully compensated as well.

Liquidating his assets, repaying his victims and reporting his conduct to authorities is the type of mitigating conduct that differentiates Dave from so many others. It is the type of conduct that the Court should consider when it approaches sentencing because, if those efforts do not warrant a variation from the guidelines' formulaic approach, what does? While a sentence of imprisonment may be required for Dave Hansen's conduct, a guideline sentence would not fairly account for the absolute rarity of his exemplary post-criminal activity, and in fact would disincentivize it. The Court should impose a sentence that recognizes the ways in which Dave's conduct is truly different.

## V.     Dave Hansen Has Learned His Lesson – His Story Is Already a Cautionary Tale.

Section 3553(a) requires the Court to impose a sentence that will provide adequate deterrence to criminal conduct and protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(B) & (C).

Specific deterrence and the need to protect the public simply are not issues in this case. One cannot reasonably claim that the Court needs to impose a sentence of significant imprisonment to deter Dave Hansen from future criminal conduct. The experience of the last four years has been a tremendous deterrent alone. It bears repeating what Dave Hansen has already lost as a result of his action: the successful thriving business he worked 12 years to build, the beautiful home beloved by his family, the ability to practice in his chosen profession, his place within the Idaho Falls community, all material personal possessions, the limited savings he had accumulated for his

family's future including, most importantly, his children's college funds, and, of greatest import, the trust and respect of his Idaho Falls community. In her letter to the Court, Tori Hansen candidly acknowledged that Dave's conduct cost him "his good reputation." That self-inflicted harm was so severe that Dave and Tori thought the only way for the family to recover was to start anew somewhere where Yellowstone would not precede their every move.[85] Leaving a lifetime of friends and community was an especially difficult penalty to pay, but one that could not be avoided.

And, while Dave has been able to repay the many victims of his conduct, the sudden demise of Yellowstone has placed him a precarious financial position. As noted above, Dave expanded Yellowstone's operations in part through strategic acquisitions financed through commercial lending. Dave personally guaranteed many of those corporate obligations. While Dave was able to maintain Yellowstone's clientele through the turmoil of 2016, Dave was severed from the company's operations at the SEC's request, Yellowstone's clients immediately began to transfer their funds to new wealth managers ultimately resulting in the company's collapse. Yellowstone eventually ceased operations, leaving substantial outstanding financial obligations unpaid. Dave now finds himself personally liable for close to $2.4 million of Yellowstone-related debt. Finally, in addition to the government's criminal prosecution, Dave remains subject to a yet unresolved civil action brought by the SEC as well as the restitution and forfeiture orders of this Court. In light of all of these facts, the suggestion that the Court needs to incarcerate Dave Hansen to "teach him a lesson," rings hollow.

---

[85] It is unsurprising that the Post Register continues to follow this case closely and has published stories reporting on this case from the original FBI search of Yellowstone's offices through Dave's guilty plea. *See, e.g.,* Jonathan Hogan, *Former Yellowstone Partners CEO Pleads Guilty to Wire Fraud*, Post Register (December 17, 2019), https://www.postregister.com/news/crime_courts/former-yellowstone-partners-ceo-pleads-guilty-to-wire-fraud/article_5c84bb36-889a-5003-9fcd-0ba6bc70912a.html.

There is also no need for the Court to impose some severe penalty as a cautionary tale for others. For the reasons outlined above, it is clear that Mr. Hansen already fulfills that role. Finally, there is no need to incarcerate Mr. Hansen to protect the public from some unforeseen future bad acts. Dave's conduct has been exemplary while on pretrial release. In fact, his conduct has been exemplary since the summer of 2016. There is simply no basis to use sentencing as a means to isolate from the public.

## VI.    Unwarranted Sentencing Disparities

Section 3553(a)(6) directs that in imposing sentence, the Court should fashion a judgment that "avoid(s) unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). For all the reasons noted above, this case and this defendant are markedly different from most "other" wire fraud prosecutions. For this reason, the list of out-of-circuit cases cited by the government in its sentencing memorandum are inapt. D.E. 143 at 26. Moreover, there are numerous cases in which defendants who have caused much greater, lasting harm to victims (and who lack Dave Hansen's unique mitigating factors) have been sentenced to significantly less time than advocated by the government here. For example, this Court sentenced Michael Justin Hoopes, an investment advisor who provided false monthly account statements to his clients while he misappropriated $620,000 from his clients to 24 months in prison.[86] The District Court for the District of Utah sentenced Eric Larson Sampson to 36 months in prison and ordered $3 million in restitution for engaging in a securities

---

[86]    Department of Justice-U.S. Attorney's Office for the District of Idaho, Day Trader Sentenced for Investment Fraud Scheme (June 16, 2015), https://www.justice.gov/usao-id/pr/day-trader-sentenced-investment-fraud-scheme. Each of the noted DBSI defendants was also ordered to pay restitution in the amount of $32 million.

fraud Ponzi scheme.[87]   In *United States v. Gordon*, the Ninth Circuit affirmed Robert Gordon's sentence of 66 months of imprisonment for a 4-year long embezzlement scheme with losses of $15 million.[88]   The recent Diversified Business Services and Investments, Inc. (DBSI) scheme resulted in losses in the hundreds of millions of dollars for which Mark Ellison was sentenced to 60 months in prison; Jeremy Swenson was sentenced to 36 months in prison, and David Swenson was sentenced to 36 months in prison.[89]   In comparison to these cases, the sentence advanced by the government would be excessive.

## VII.   The Meaning of COVID- 19

### A.   A Prison Pandemic

Consistent with the parties' plea agreement, on May 27, 2020, Mr. Hansen advised the government in writing that he would seek a variance based on the BOP crisis created by the COVID-19 pandemic.  Surprisingly, the government's memorandum does not address this issue at all.  Section 3553(a) mandates that, in imposing a sentence, the Court shall endeavor to provide the defendant with needed medical care or other correctional treatment in the most effective manner.  18 U.S.C. § 3553(a)(2)(D).  Today, that means accounting for COVID-19.

Dave's sentencing will occur in one of the most unique times in American history.  Dave was originally scheduled to be sentenced on April 15, 2020.  That date had to be delayed multiple times as the COVID-19 virus struck all segments of American life.  And while the judicial system

---

[87]   *United States v. Sampson*, Case No. 18 CR 19 (D. Utah. January 11, 2018); Felony Information and Judgment.

[88]   *See United States v. Gordon*, 393 F.3d 1044, 1050-51 (9th Cir. 2004), abrogated by *Lagos v. United States*, 138 S. Ct. 1684, 201 L. Ed. 2d 1 (2018). *Gordon* is cited in the government's restitution brief. *See* D.E. 142, 2.

[89]   Department of Justice-U.S. Attorney's Office for the District of Idaho, DBSI Defendants Detained Pending Prison Designation (July 10, 2018), https://www.justice.gov/usao-id/pr/dbsi-defendants-detained-pending-prison-designation.

adapts and crawls back to life, the Bureau of Prisons remains substantially impaired by the virus. This is because, unfortunately, prison facilities have proven particularly vulnerable to COVID-19 outbreaks. The unavoidable close confinement of inmates and the general lack of space to permit distancing of the incarcerated has created a crisis for the BOP and with it, the criminal justice system as a whole. Prison after prison has seen outbreaks of the virus with deadly results.[90]

In response to the unique threat this epidemic poses to the incarcerated and the Bureau of Prisons staff, the BOP has quickly implemented a series of protective measures in an effort to prevent the spread of the disease throughout its facilities. All new inmates are "placed in quarantine for a minimum of 14 days or until cleared by medical staff."[91] Similarly, BOP staff has implemented new policies to monitor and protect prison guards, including suspending official staff travel, suspending staff training, suspending non-essential contractor access, and enhanced health screening for staff.[92] Yet, despite these mitigation efforts, as of June 7, 2020, the BOP was reporting 5,935 federal inmates and 636 BOP staff who have or have had confirmed positive test results for COVID-19. Tragically, 79 federal inmates and one BOP staff member have already died as a result of COVID-19 outbreaks in BOP facilities.[93] And, while these numbers are staggering, they reflect a significant underreporting of cases as the BOP has not actively tested all inmates. Rather, the BOP continues to test only those patients exhibiting signs of possible

---

[90]   There have been more than 40,000 confirmed COVID-19 cases in prisons and jails across 47 states resulting in nearly 500 deaths. The Marshall Project, *A State-by-State Look at Coronavirus in Prisons*, https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons (last visited June 8, 2020).

[91]   Bureau of Prisons, COVID-19 Action Plan-Phase Five, www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp. (last visited April 15, 2020).

[92]   Bureau of Prisons, BOP Implementing Modified Operations, https://www.bop.gov/coronavirus/covid19_status.jsp  (last visited June 11, 2020).

[93]   Bureau of Prisons, *COVID-19 Cases*, https://www.bop.gov/coronavirus (last visited June 8, 2020).

infection.[94]  What is evident, however, is that when the virus takes hold in a prison, it spreads like a brush fire.[95]

As frightening as the BOP's outbreak has been, the government's significant swift response to the prison system's isolated pandemics reflects the problems to come.  With an active prison population of close to 140,000 individuals held in close quarters in 110 prisons, future BOP facility outbreaks harming both inmates and staff are inevitable.  What's more, the BOP is simply not designed to handle the unique and challenging medical needs of patients stricken with COVID-19.  The BOP has long prided itself on its ability to meet the varied, challenging medical needs of its incarcerated population.  It has done so, in part, by transferring patients to one of its specialized medical facilities that have the means to treat prisoners' needs.  However, COVID-19's highly contagious nature does not allow for the inter-facility transfer of those prisoners in need of heightened care.[96]

As a result of the virus outbreak within its facilities, on March 26, 2020, Attorney General Barr issued a public Memorandum to the Director of the Bureau of Prisons in which he instructed

---

[94]   The BOP's limited, yet targeted testing that has resulted in a shockingly high rate of identified infection.  According to ABC News reporting dated May 1, 2020, 70% of BOP inmates tested were positive for COVID-19.  *See Luke Barr, 70% of inmates tested have COVID-19: Bureau of Prisons*, ABC News (May 1, 2020) https://abcnews.go.com/US/70-inmates-tested-covid-19-bureau-prisons/story?id=70454527.

[95]   *See, e.g.,* Paige Pfleger, *Inside Marion Correctional Institution, The Country's Biggest Coronavirus Hotspot*, WOSU Radio (April 23, 2020), https://radio.wosu.org/post/inside-marion-correctional-institution-countrys-biggest-coronavirus-hotspot#stream/0 (reporting on Marion Correctional Institution in Marion, Ohio wherein 80% of the prison's population contracted COVID-19 in the early days of the pandemic).

[96]   In fact, as a precautionary measure, "[i]n order to mitigate the spread of COVID-19," the Bureau of Prisons has implemented modified operations that include a freeze on intra- as well as inter-facility transfers of prisoners.  *See* https://www.bop.gov/coronavirus/covid19_status.jsp (announcing that "inmate internal movement is suspended with limited exceptions") (last visited May 26, 2020).

the BOP to use its discretionary authority to release non-violent prisoners meeting various criteria to serve the remainder of their sentences on home confinement.[97]  In a subsequent April 3, 2020 memorandum directing the implementation of that directive with haste, the Attorney General ordered the BOP to "maximize the use of home confinement at affected institutions."[98]  The Attorney General's swift action was made possible by the emergency CARES Act provisions signed by President Trump on March 27, 2020, which lifted Title 18, U.S.C. § 3624(c)(2)'s prior limitations on the use of home incarceration by the BOP during the course of the pandemic.  Cares Act, P.L. 116-136, 134 Stat 281, § 12003(b)(2).

In response, the Bureau of Prisons has been transferring a flood of prisoners to serve the remainder of their sentences from the isolation of home.  In just over two months, the BOP has increased the number of inmates serving their sentences in home confinement by 124 percent, and as of June 2, 2020 had identified nearly 1,000 additional inmates for transfer home.[99]  These transfers are in addition to the escalating number of defendants released from BOP prisons under the compassionate release provisions of the First Step Act.

The relocation of some high-profile detainees to home incarceration exemplifies the scope of the government's efforts.  By way of example, the President's former campaign manager, Paul Manafort, was recently released from BOP custody after serving roughly a quarter of a 7½-year

---

[97]   *See* Memorandum for Director of Bureau Prisons: Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic, https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf (March 26, 2020).

[98]   *See* Memorandum for Director of   Bureau Prisons:  Increasing   Use   of   Home Confinement   at   Institutions   Most   Affected   by   COVID-19,   https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement_april3.pdf (April 3, 2020).

[99]   *See* Statement of Michael D. Carvajal, Director of the Bureau of Prisons, before the Committee   on   the   Judiciary,   United   States   Senate,   Dated   June   2,   2020; https://www.judiciary.senate.gov/imo/media/doc/Carvajal-Allen%20Joint%20Testimony.pdf

US.128311917.03

sentence for fraud.[100]  The President's former counsel, Michael Cohen reported to prison in May 2019 to serve a three-year sentence.[101]  A year later, he too has been released to complete his sentence from home.[102]

Although the BOP has been trying to identify and process prisoners for release to home confinement with haste, a series of prison class action lawsuits have been filed on behalf of federally incarcerated across the country to force additional action.  On April 22, 2020, a federal district court for the District of Ohio entered an order that effectively requires the release or transfer of over 800 inmates from the Elkton FCI prison where nine inmates had already died from COVID-19.[103]  Another lawsuit was filed on May 26, 2020 on behalf of the prisoners at the Butner FMC, one of the BOP's six medical facilities.  As noted in the plaintiffs' pleadings, Butner has had an outbreak with nearly 375 inmates and 44 staff members testing positive for the virus, already

---

[100]  *See* Eileen Sullivan, *Paul Manafort, Trump's Ex-Campaign Manager, Released to Home Confinement*, the New York Times (May 13, 2020), https://www.nytimes.com /2020/05/13/us/politics/paul-manafort-released-coronavirus.html.

[101]  *See* Matt Perez, *Report: Trump's Ex-Attorney Michael Cohen To Be Released From Prison On Thursday*, Forbes (May 20, 2020), https://www.forbes.com/sites/mattperez/2020/05/20/report-trumps-ex-attorney-michael-cohen-to-be-released-from-prison-on-thursday/#5641e4a258c6.

[102]  *Id.*  There have been also been similarly high-profile releases of prisoners under the First Step Act.  For example, Glenn Lewellen, a corrupt narcotics officer convicted of teaming up with gang members who robbed and kidnapped rival drug dealers, was ordered released from prison six years early due to the threat of the virus.  *See* https://www.chicagotribune.com/news/criminal-justice/ct-chicago-police-glenn-lewellen-released-coronavirus-20200523-7tc3v3xdp5gezcpwwlj 337eurq-story.html.

[103]  *See* Amy Howe, *Court rejects – at least for now – government's request to block Ohio prisoner release plan*, SCOTUSblog (May 26, 2020), https://www.scotusblog.com/2020/05/court-rejects-at-least-for-now-governments-request-to-block-ohio-prisoner-release-plan/ (reporting on *Williams, Warden, et al. v. Wilson, Craig, et al.*, No. 19A1041 (May 26, 2020) (Denial of Application)).

US.128311917.03

resulting in the death of 10 inmates.[104]  Similar class action lawsuits have been filed against state and federal prisons in California,[105] Illinois,[106] Connecticut,[107] New York,[108] and Colorado.[109] These lawsuits highlight the urgency of action facing all prisons.

As noted above, Section 3553(a)(2)(D) instructs that in determining the sentence to be imposed, the Court shall consider the most effective medical care or treatment appropriate for the defendant.  The Attorney General has acknowledged that the BOP cannot protect prisoners from COVID-19.  Prison facilities are not designed for social distancing or to isolate and treat patients who contract the disease and cannot adequately protect the employees necessary to ensure prison security.  Thus, at this unique time in our nation's history, sentences of incarceration within BOP facilities simply are not appropriate for non-violent, first-time offenders at low risk of recidivism.

Mr. Hansen recognizes, however, that the COVID-19 pandemic does not absolve him from receiving and serving a sentence that provides just punishment for his offense.  The Court,

---

[104] *See* Dane Kane, *Inmates file coronavirus lawsuit seeking more releases from Butner federal prison in NC*,  News & Observer (May 26, 2020) https://www.newsobserver .com/news/coronavirus/article242994201.html.

[105] Len Wood, *Lompoc prison accused of 'cruel and unusual' punishment in COVID-19 class-action lawsuit*, Santa Maria Times (June 5, 2020), https://santamariatimes.com/news/local/crime-and-courts/lompoc-prison-accused-of-cruel-and-unusual-punishment-in-covid-19-class-action-lawsuit/article_343388bd-74ae-539a-ba46-3456cb9af2a6.html.

[106] Uptown People's Law Center, *Class Action Lawsuits*,  https://www.uplcchicago.org/what-we-do/prison/class-action-lawsuits.html (last visited June 8, 2020).

[107] Walter Pavlo, *Federal Judge Demands Action At Danbury Federal Prison As COVID-19 Spreads*, Forbes (May 14, 2020), https://www.forbes.com/sites/walterpavlo/2020/05/14/federal-judge-demands-action-at-danbury-federal-prison-as-covid-19-spreads/#29f8de074959.

[108] The Legal Aid Society, *LAS Files Second Lawsuit for Release of Prisoners at Riker's Island Amid COVID-19 Outbreak* (March 25, 2020),   https://www.legalaidnyc.org/news/legal-aid-second-lawsuit-release-prisoners-rikers-island-covid-19/.

[109] Lance Benzel and Evan Wyloge, *3rd COVID-19 death at Sterling prison adds to widening outbreak*, The Gazette, (June 6, 2020), https://gazette.com/news/3rd-covid-19-death-at-sterling-prison-adds-to-widening-outbreak/article_90886d66-a78e-11ea-9f76-97d4b0dd2470.html.

however, has options in structuring a sentence to address the policy goals of Section 3553(a) and, at the same time, protecting Dave, other inmates and BOP staff from this unique and deadly virus.

**B.      Mr. Hansen May Be At a Higher Risk for COVID-19.**

Although Dave is an otherwise healthy adult, he has a respiratory problem (sleep apnea) and high cholesterol[110] which make him at risk for COVID-19.[111] These health risks should be considered by the Court in making its sentencing determination.

Dave has suffered from sleep apnea for a number of years and "wears a C-PAP machine at night." *See* PSR, ¶ 96.  C-PAP machines prevent the interruption of breathing during the night caused by sleep apnea.[112]  However, C-PAP machines were not designed for patients who suffer from COVID-19 and there is concern in the medical community that these machines could further spread the virus in a confined setting (like prison) due to the enhanced airflow they generate.[113] It is due to this risk that the California Department of Corrections and Rehabilitation has requested that inmates cease the use of their C-PAP machines.[114] This has left inmates with a grim choice, continue to use their C-PAP machines and increase the risk of spreading COVID-19 or cease the

---

[110] PSR, ¶ 96.

[111] Brita Belli, *Sleep apnea devices need filter for use in COVID-19, Yale doctor warns*, Yale News (April 20, 2020), https://news.yale.edu/2020/04/20/sleep-apnea-devices-need-filter-use-covid-19-yale-doctor-warns; David Templeton, *Cholesterol could be the culprit in COVID-19 deaths*, Pittsburgh Post-Gazette (June 7, 2020), https://www.post-gazette.com/news/health/2020/06/07/Cholesterol-COVID-19-deaths-study-scripps-research-institute-underlying-conditions/stories/202006040179.

[112] Brita Belli, *Sleep apnea devices need filter for use in COVID-19, Yale doctor warns*, Yale News (April 20, 2020), https://news.yale.edu/2020/04/20/sleep-apnea-devices-need-filter-use-covid-19-yale-doctor-warns.

[113] *Id.*

[114] Emily Dugdale, *Fighting Coronavirus, State Prisons Seek To Disable Inmates' Sleep Apnea Machines*, LAist (April 16, 2020), https://laist.com/2020/04/16/coronavirus_california_state_prisons_sleep_apnea-cpap_disable.php.

use of the devices incurring the increased risks of suffering the adverse health consequences a C-PAP is designed to prevent.

Dave also suffers from high cholesterol and takes medicine for it. PSR, ¶ 96. There is some research that high cholesterol may be linked to adverse COVID-19 virus affects.[115]  Based on a recent press report, researchers at the Scripps Research Institute have found a "chain-reaction process that begins with high cholesterol levels and ends with a cytokine storm that fills the lungs with fluid."[116] It was, in part, due to similar health conditions that the Southern District of New York found that an inmate should be immediately released after serving roughly half his sentence. *See United States v. Scparta*, No. 18-CR-578 (AJN), 2020 WL 1910481, at *1 (S.D.N.Y. Apr. 20, 2020) (Scparta, a 55-year-old non-violent first-time offender with high cholesterol and sleep apnea, was immediately released under the First Step Act). The *Scparta* court recognized that "individuals in carceral settings are at particularly high risk for contracting the disease because of the inability to individuals to socially distance, shared communal spaces, and limited access to hygiene products." *Id.* at *7.  These concerns continue to arise and courts across the country continue to order similar compassionate releases.[117]  Though the majority of these cases involve

---

[115]  David Templeton, *Cholesterol could be the culprit in COVID-19 deaths*, Pittsburgh Post-Gazette (June 7, 2020), https://www.post-gazette.com/news/health/2020/06/07/Cholesterol-COVID-19-deaths-study-scripps-research-institute-underlying-conditions/stories/202006040179.

[116]  *Id.*

[117]   *See United States v. Connell*, No. 18-CR-00281-RS-1, 2020 WL 2315858, at *6 (N.D. Cal. May 8, 2020) (Released to home confinement due to hypertension, *high cholesterol*, and pre-diabetes); *United States v. Jackson*, No. 5:02-CR-30020, 2020 WL 2735724, at *1 (W.D. Va. May 26, 2020) (Released to home confinement due to due to type 2 diabetes, asthma, *sleep apnea*, and obesity); *United States Of America, v. Johnnell Smith*, No. 15-CR-30039, 2020 WL 3027197, at *1 (C.D. Ill. June 5, 2020) (Released to home confinement due to *sleep apnea*, hypertension, and morbid obesity); *United States v. Delgado*, No. 3:18-CR-17-(VAB)-1, 2020 WL 2464685, at *6 (D. Conn. Apr. 30, 2020) (Released to home confinement due obesity and *sleep apnea*).

individuals already imprisoned, there is at least one recent case in which a court imposed home confinement at the sentencing stage in which the defendant, facing a guideline maximum of 37 months for insider trading, was sentenced to a year of home confinement due to the effects of COVID-19 on individuals with asthma.[118]

## VIII.   Mr. Hansen's Sentencing Request

COVID-19 has fundamentally transformed the way in which courts approach sentencing for non-violent cases.  Prison may represent a penalty deserved, but when that penalty may also increase the risk of severe illness and/or death, standard approaches to sentencing must be reevaluated.

### A.   A Sentence of Probation with Home Confinement is Appropriate Under the Current Unique Circumstances.

As noted above, the Supreme Court has instructed that district courts should use their ample discretion to fashion a sentence that is fitting for the individualized circumstances of each specific case.  This Court thus has unfettered discretion as to what weight to place on any one of the Section 3553 factors to fashion a sentence that is, in the end, "sufficient, but not greater than necessary to serve the purposes of sentencing" under the unprecedented circumstances of our time.  Finally, and perhaps most importantly, the Supreme Court has rejected "an appellate rule that requires 'extraordinary' circumstances to justify a sentence outside the Guidelines range."  *Gall v. United States*, 552 U.S. 38, 47 (2007).  Applying these principles, courts have rejected "the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the

---

[118] Pete Brush, *Ex-Goldman Banker Avoids Prison For Passing Insider Tips*, Law360 (June 8, 2020), https://www.law360.com/whitecollar/articles/1281300/ex-goldman-banker-avoids-prison-for-passing-insider-tips?nl_pk=62399cd2-9cd1-4970-91f8-b76f309b9229&utm_source=newsletter&utm_medium=email&utm_campaign=whitecollar (reporting on *USA v. Cohen*, 19-cr-00741, in the U.S. District Court for the Southern District of New York).

US.128311917.03

strength of the justifications required for a specific sentence." *Id.*; *see also United States v. Boyer*, 275 F. App'x 655, 656 (9th Cir. 2008) (upholding below guideline sentence); *United States v. Johnson*, 471 F.3d 764, 766 (7th Cir. 2006) ("[T]he statute does not weigh the factors. That is left to the sentencing judge, within the bounds of reason, which are wide.").

Before the current pandemic, Mr. Hansen would not have asked the Court to impose a probationary sentence. COVID-19 has, however, changed our understanding of and approach to so many things.

Pursuant to 18 U.S.C. § 3561(c)(1), the Court can sentence Mr. Hansen to a period of probation of 1 to 5 years. The Court can impose restrictions upon Mr. Hansen as conditions of that probation, including, for example, that Mr. Hansen be confined to his home during that entire extended term of probation. While such extended terms of home confinement are unusual, these are unusual times. And, although home confinement is, admittedly, not incarceration, a sentence of probation is not a "free pass" by any means.[119]

> [P]robation is also a punitive measure, and "may be used as an alternative to incarceration, provided that the terms and conditions of probation can be fashioned so as to meet fully the statutory purposes of sentencing, including promoting respect for the law, providing just punishment for the offense, achieving general deterrence, and protecting the public from further crimes by the defendant."

*United States v. Brady*, 2004 WL 86414, at *8-9 (E.D.N.Y. Jan. 20, 2004) (quoting U.S. Sentencing Guidelines Manual ch. 5, pt. B, Intro. Cmt.); *see also Gall*, 552 U.S. at 48, fn 4, ("[T]he probation or parole conditions imposed on an individual can have a significant impact on both that person and society.... Often these conditions comprehensively regulate significant facets of their

---

[119] As the Supreme Court has explained: "[C]ustodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty." *See Gall*, 552 U.S. at 47-48 (citing *United States v. Knights*, 534 U.S. 112, 119 (2001)).

US.128311917.03

day-to-day lives.") (quoting 1 N. Cohen, The Law of Probation and Parole § 7:9 (2d ed. 1999)).

As recent shelter-in-place orders have taught us all, home confinement is, in fact, a significant

restriction.[120]  It is therefore not surprising that even before the pandemic, district courts imposed

sentences of probation for defendants in a wide variety of cases, regardless of the otherwise

applicable advisory guideline ranges.[121]  Given the COVID-19 world in which we now live, such

a sentence is appropriate.

 Mr. Hansen respectfully submits the Court should sentence him to probation with home

confinement and/or home detention for whatever term the Court believes appropriate, including

up to the maximum allowed by statute.  *See* 18 U.S.C. § 3561(c)(1).  In imposing that sentence,

the Court can add all appropriate additional conditions (including, for example, community

services requirements).

---

[120] *See* Sam Dorman, *Trump call on states to 'liberate' their people from coronavirus restrictions*, Fox News (April 17, 2020), https://www.foxnews.com/politics/trump-liberate-states-economy-reopen (reporting that President Trump had called on various midwestern states to "LIBERATE" their citizens from the burden of home confinement).

[121] *See, e.g., Gall*, 552 U.S. 38 (while Guidelines recommended 30-37 months incarceration, sentence of probation found appropriate and upheld); *United States v. Tomko*, 562 F.3d 558 (3d Cir. 2009) (*en banc*) (affirming sentence of probation with period of home detention, community service, and a fine for tax evasion, rather than to term of imprisonment); *United States v. Bueno*, 549 F.3d 1176, 1181 (8th Cir. 2008) (imposing sentence of probation on defendant where government had requested 108-135 months incarceration, and stating: "as the Court noted in *Gall*, 'Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty.'"); *United States v. Hawkins*, 2007 WL 1241538 (2d Cir. 2007) (upholding sentence of probation in healthcare fraud case despite advisory guidelines suggesting 12-18 months incarceration); *United States v. Desmond*, 2008 WL 686779 (N.D. Ill. March 11, 2008) (defendant pled guilty to perjury and admitted to wire fraud and mail fraud; despite advisory guideline sentence of 60 months, court sentenced defendant to probation); *United States v. Yambor*, 2010 WL 3910327 (E.D. Wis. Oct. 2, 2010) (imposing sentence of probation with home confinement for a defendant who committed a $200,000 fraud on her employer over four years); *United States v. Collado*, 2008 WL 2329275 (S.D.N.Y. June 5, 2008) (three years' supervised release with certain conditions, 200 hours of community service and a $100 assessment."); *United States v. Coughlin*, 2008 WL 313099 (W.D. Ark. Feb. 1, 2008) (sentence of probation with home detention despite advisory Guideline range of 33-41 months).

US.128311917.03

**B.     Alternatively, the Court Could Use its Vast Discretion to Impose a Term of Home Detention Before Incarceration.**

Mr. Hansen would alternatively request that the Court impose a sentence that includes a term of home detention before imprisonment.  Mr. Hansen candidly acknowledges that the statutory rubric for sentencing does not currently allow a Court to impose a sentence of probation with home detention to precede a term of incarceration.[122]  However, under the principles outlined in both *Booker* and *Gall*, the Court can effectively impose such a sentence by: (1) determining the sentence of imprisonment it would have imposed *but for* the COVID-19 pandemic; (2) reduce the term of that sentence by some reasonable period, *e.g.*, 18 months; (3) enter a judgment with a report date extended by the same amount of time as the sentence reduction; and (3) change the conditions of Mr. Hansen's pretrial release to include a condition of home detention.  Through this approach, the Court would technically impose a sentence of imprisonment that is less time than the Court would have otherwise imposed, but would restrict Mr. Hansen's liberty for the full term contemplated by the Court, all in a manner that protects the health and safety of not only Mr. Hansen, but the other inmates and staff within the BOP system while the medical community attempts to find a solution to COVID-19.  The imposition of such a sentence retains the Court's intended penalty while allowing Mr. Hansen to serve the initial period of his sentence outside of the BOP and its attendant risks.

**C.     A Guideline Sentence Is Excessive**

As noted above, Mr. Hansen candidly admits that absent the COVID-19 pandemic, he would not ask the Court to impose a sentence of probation for his offense.  Yet, while a term of

---

[122] Although the statutory scheme allows the inverse—a sentence of incarceration followed by restriction supervision that is akin to probation—it does not provide for less restriction forms of detention to precede incarceration.

US.128311917.03

imprisonment may be appropriate under normal circumstances, the imposition of a guideline sentence would be excessive given the facts and circumstances of Mr. Hansen's conviction.

In the parties' plea agreement, Mr. Hansen and the government both agreed that the applicable guideline calculations result in an offense level of twenty-six. *See* D.E. 114 at V(B)(4). The probation officer has adopted those calculations as correct in her presentence investigation report. *See* PSR, ¶¶ 64-75. Based on those calculations, with no criminal history, Mr. Hansen would qualify for an advisory sentencing range of 63 to 78 months of imprisonment.

In their plea agreement, the parties agreed that while the government would request a sentence within that agreed upon guideline range, Mr. Hansen was free to seek a variance from the otherwise applicable range. *See* D.E. 116; at I(A) & V(B)(5). The reasons the government agreed Mr. Hansen could seek a variance were clear—Mr. Hansen's decision to self-report Yellowstone's overbilling to the SEC and to liquidate his personal and professional assets to reimburse the majority of those clients who had been improperly charged, *all before he was aware of an existing governmental investigation*, differentiates this case from so many other fraud cases. Mechanically applying a guideline sentence that does not account for this conduct would improperly elevate the guidelines over the application of Section 3553(a)'s factors in contravention of clear Supreme Court precedent.

In its memorandum, the government attempts to buttress its sentencing recommendation based on the guidelines' "important institutional role." D.E. 143 at 27. The government goes so far as to suggest that any derivation from a guidelines sentence reflects "the luck of the draw in judicial assignments" instead of an individualized assessment of the defendant and his conduct. *Id.* The guidelines are but one factor under Section 3553(a). Utilizing the guidelines as *de facto* sentencing brackets diminishes the careful consideration of "every convicted person as an

individual and every case as a unique study," which is, of course, the fundamental purpose of sentencing. *Koon*, 518 U.S. at 113.

Dave Hansen's pre-indictment remediation efforts demonstrate how the guidelines can overstate offense conduct. The guidelines' provisions focus on a defendant's *intended* offense conduct and not on the criminal activity's ultimate impact. Accordingly, there are no guideline sections to account for a defendant's post-offense corrective measures. Thus, Dave's guidelines would be the same if he had never repaid a single victim and instead waited for the Court's judgment before addressing the issue of restitution.

Yet, as the Court is aware, Dave's corrective conduct greatly diminished the impact of an offense that, when mechanically applied, implicated so many guideline provisions. Thus, while Mr. Hansen's offense conduct admittedly affected over ten victims, only one uncompensated Yellowstone investor remains unpaid. Moreover, while Dave Hansen improperly billed clients over $2.6 million, only a single investor, Victim J.D., remains not fully compensated and she is owed slightly less than $900,000. If the Guidelines accounted for Mr. Hansen's remediative conduct and victims' actual losses, these two enhancements would have been reduced and Mr. Hansen would have an offense level of 22, resulting in Guideline range of 41 to 51 months. Application of that reduced sentencing range is much more befitting of the impact of Mr. Hansen's crime and appropriately recognizes his remedial efforts. Mr. Hansen therefore respectfully submits that while his guidelines may be accurately calculated based on an offense level of 26, the Court should consider any sentence based on an advisory range that is more consistent with the ultimate impact of his conduct—a sentence within the range that would be applicable to an offense level of 22. Using that range as a guide, the Court should further assess Mr. Hansen's other 3553(a) factors, like his extraordinary history of charitable work and the impact of COVID-19.

## IX.     Restitution

On March 18, 2020, Mr. Hansen submitted a lengthy Statement on Restitution addressing the restitution schedules that the government had submitted to the probation officer.  D.E. 127.[123] Almost a month later, on April 10, 2020, the government provided a letter to the probation officer summarily stating that it "st[ood] by its calculation and supporting analysis" and stated that it would further address Mr. Hansen's analysis in its sentencing memorandum.  *See* Ex. WW, April 10, 2020 Letter from J. Hurwit to J. Thompson-Kelley.  On June 9, 2020, nearly 3 months after Mr. Hansen submitted his Statement on Restitution and only a week before the Court's scheduled sentencing hearing, the government filed its responsive Statement on Restitution.  *See* D.E. 142. That filing suffers from both factual and legal errors.  However, because the government chose to file its restitution submission only a week before the sentencing hearing, Mr. Hansen will address those arguments at the sentencing hearing.

## X.     The Court Should Not Impose a Fine

Although the government did not object to the probation officer's earlier conclusion that Mr. Hansen "does not appear able to pay a fine within the applicable guideline range," D.E. 125, ¶ 114, the probation officer revised Paragraph 114 of the PSR to find that Mr. Hansen now "appears able" to pay a fine within the applicable guideline range because "he has sufficient education, work experience and earning potential." D.E. 135, ¶ 114. Respectfully, this revised determination is irreconcilable with Paragraphs 112 and 113 of the PSR, which correctly record that Mr. Hansen has outstanding liabilities in excess of $6.5 million, *excluding* any orders of restitution and forfeiture to be imposed by the Court. In light of these existing outstanding liabilities, plus the restitution and forfeiture Mr. Hansen will owe,

---

[123]  A copy of Mr. Hansen's Statement on Restitution is attached hereto as Exhibit VV and incorporated herein by reference.

Mr. Hansen disputes the PSR's finding that he is able to pay a guideline fine, despite his education and work experience.

**XI.     Conclusion**

Dave Hansen is aware that it is his own conduct that has brought him to this moment in his life.  Dave knows that this long and arduous journey is not over, but, in pleading guilty, he hopes to find a way to the other side of now.  He respectfully asks that the Court impose a sentence consistent with the requests of this memorandum.


DATED this 11th day of June 2020.

FAEGRE DRINKER BIDDLE & REATH LLP

/s/ *Luis E. Quinones Fernandez*
Joel M. Hammerman
Luis. E. Quinones Fernandez
Faegre Drinker Biddle & Reath LLP
311 S. Wacker Dr., Suite 4300
Chicago, IL 60606
Email: joel.hammerman@faegredrinker.com
Email: luis.quinones@faegredrinker.com

SMITH WOOLF ANDERSON & WILKINSON, PLLC

/s/ *Curtis R. Smith*
Curtis R. Smith
3480 Merlin Drive
Idaho Falls, ID 83404
Phone: (208) 525-8792
Email: curtis@eastidaholaw.net

*Attorneys for Defendant, David Hansen*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 11, 2020, the foregoing **DAVID HANSEN'S SENTENCING MEMORANDUM** was electronically filed with the Clerk of the Court using the CM/ECF system, and that a copy was served on the following parties:

Joshua David Hurwit
Joshua.hurwit@usdoj.gov

Raymond E. Patricco
Raymond.patricco@usdoj.gov

/s/ Luis E. Quinones Fernandez

US.128311917.03