UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>DAVID HANSEN,<br><br>　　　　　Defendant. | Case No. 4:18-cr-00346-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

# I. OVERVIEW

This matter comes before the Court on the issue of restitution. The Court sentenced David Hansen on June 17, 2020. Dkt. 161. As part of sentencing, the Government requested restitution for various victims in this case. Hansen objected to the amount of restitution requested by the Government. Accordingly, the Court set an evidentiary hearing for June 26, 2020, in order to determine the scope and amount of restitution. *Id.* On June 26, 2020, and July 9, 2020, the Court heard oral argument and testimony on restitution and took the matter under advisement. For the reasons outlined below, the Court orders restitution in the amount of $2,215,764.31.

# II. BACKGROUND

On November 15, 2018, the Government charged Hansen by Indictment with multiple Counts of Wire Fraud, in violation of 18 U.S.C. § 1343. Dkt. 1. The Indictment stemmed from allegations that Hansen knowingly and intentionally devised a scheme to

defraud clients of his company, Yellowstone Partners, LLC ("Yellowstone"). *Id*. The Government alleged that Hansen sought to obtain money and property belonging to various clients by means of materially false and fraudulent pretenses, representations, and promises, and to misappropriate, without authority, money and property belonging to individual clients to himself. *Id*.

On November 25, 2019, Hansen filed a Plea Agreement with the Court. Dkt. 116. As part of that Plea Agreement, Hansen agreed to pay restitution to the victims in an amount to be determined by the Court. On December 17, 2019, Hansen pled guilty (Dkt. 119) to Count Sixteen of the Superseding Indictment (Dkt. 56), and was subsequently sentenced on June 17, 2020, to sixty months of incarceration followed by three years of supervised release (Dkt. 161). The Court heard oral argument and testimony regarding the amount of restitution on June 26, 2020, and July 9, 2020, and took the matter under advisement. Dkts. 164, 170.

### III. LEGAL STANDARD

Under 18 U.S.C. § 3664(e), "a dispute as to the proper amount of restitution must be resolved by the district court by a preponderance of the evidence." *United States v. Andrews*, 600 F.3d 1167, 1171 (9th Cir. 2010) (citations omitted). The Government bears the burden of proving that a person is a victim for purposes of restitution and the amount of the victims' losses. *Id.* To meet this burden, "the government must provide the court with enough evidence to allow the court to estimate the full amount of the victims' losses with some reasonable certainty." *United States v. Kennedy*, 643 F.3d 1251, 1261 (9th Cir.

2011) (cleaned up).[1]

To prove the amount of victims' losses, "the government must provide the district court with more than just . . . general invoices . . . ostensibly identifying the amount of their losses." *United States v. Brock–Davis*, 504 F.3d 991, 1002 (9th Cir. 2007) (quoting *United States v. Menza*, 137 F.3d 533, 539 (7th Cir.1998)). Although not requiring mathematical precision, "a restitutionary award . . . will be improper if the district court must engage in arbitrary calculations to determine the amount of the victim[s'] losses." *Kennedy*, 643 F.3d at 1261 (cleaned up). That said, district courts are granted a degree of flexibility in determining victims' losses and are to "engage in an expedient and reasonable restitution process, with uncertainties resolved with a view toward achieving fairness to the victim." *United States v. Gordon*, 393 F.3d 1044, 1048, 1053 (9th Cir. 2004), *abrogated on other grounds by Lagos v. United States*, 138 S. Ct. 1684 (2018).

## IV. DISCUSSION

The Government and Hansen agree that restitution must be paid to the victims of Yellowstone's fraudulent billing; however, they disagree as to the amount that should be repaid. At oral argument, the Government claimed that Hansen's wire fraud victims, Aileen Wolf, Robert Pedersen, and Jane Dahle ("Victims"), were each entitled to restitution in

---

[1] The parenthetical "cleaned up," while perhaps unfamiliar to some, is being used with increasing frequency to indicate that brackets, ellipses, footnote reference numbers, internal quotation marks, alterations, and/or citations have been omitted from a quotation. For an example of its use in a published opinion, see *Lu v. United* States, 921 F.3d 850, 860 (9th Cir. 2019) or *United States v. Reyes*, 866 F.3d 316, 321 (5th Cir. 2017). For a more thorough discussion regarding the practicality of the parenthetical, see Jack Metzler, *Cleaning Up Quotations*, 18 J. App. Prac. & Process 143 (2017).

various amounts totaling $2,296,385.56.[2] Hansen disagrees—for various reasons that will be discussed below—and argues that the actual total amount to be restored to the Victims is $942,110.96.[3]

At the outset, the Court notes that this matter is, frankly, confusing and convoluted. Both the Government and Hansen have altered, amended, and changed their positions on various items and amounts during the briefing and arguments on restitution—as have their experts. This, however, is not necessarily a bad thing. Hansen's scheme was calculated, but at the same time, sloppy. Some records in this case are clear and easy to interpret; others are not. Some of the issues before the Court are simple decisions; others call into question the validity and scope of complicated contracts between Yellowstone and its investors and/or deal with complex investment strategies. Ultimately, the parties worked through the issues as best they could, came to agreement on certain matters, and left the rest to the Court's discretion.

The Court has undertaken a lengthy and painstaking review of all of the documents in the record—including hundreds of pages of contracts, bills, charts, and graphs—as well as the almost six hours of evidentiary testimony on these topics. And while there are some issues that remain muddy, exact mathematical certainty is not the standard for the Court.

---

[2] In its Corrected Statement on Restitution, the Government previously argued that the total amount to be restored to Hansen's victims was $2,674,999.70. Dkt. 158. However, Glen Erikson never submitted a restitution claim (Dkt. 158), and the Government has since agreed with Hansen that $300,000 was already refunded to Pedersen on September 27, 2011.

[3] In Hansen's original Statement on Restitution, Hansen argued that only Dahle is entitled to restitution in the amount of $891,766.96. Dkt. 127. However, at oral argument, Hansen conceded that Pedersen is also entitled to restitution, but only in the amount of $50,344.00.

MEMORANDUM DECISION AND ORDER - 4

The Court's obligation is to determine restitution "with some reasonable certainty" and a "view toward achieving fairness to the victim." *Kennedy*, 643 F.3d at 1261; *Gordon*, 393 F.3d at 1048. The Court's order strives to do that today.

**A. Aileen Wolf**

The Government argues that Wolf is owed $20,428.13 in restitution. Dkt. 158. Hansen, on the other hand, argues that Wolf was actually underbilled and is not entitled to any restitution. Dkt. 127.

During oral argument, the Government established that they calculated Wolf's restitution using a 1% annual fee and a 1% quarterly fee, for a total of 2% annually. Because Wolf's investor agreement does not specify a fee percentage to be paid to Yellowstone (Dkt. 164-7, at 7), the Government assumed an annual fee of 2% based on an agreement between the Securities and Exchange Commission ("SEC") and Yellowstone that a 2% fee would be applied whenever they could not find an agreement. Hansen calls into question this purported agreement with the SEC and notes that Wolf's agreement "like many others, erroneously did not include a completed fee schedule." Dkt. 127, at n.20. Because of this, Hansen argues the Court should follow Yellowstone's general billing practice.

According to a Federal Bureau of Investigation ("FBI") interview with Cameron High, only Yellowstone's qualified investors were billed at 2%, while non-qualified investors were billed at 3% annually, including a 2% annual fee and 1% quarterly fee. Because Wolf is a non-qualified investor (Dkt. 164-7), Hansen argues that she was actually underbilled by $19,378.10 and is not entitled to restitution. But even if Wolf was billed at

2%, Hansen claims Wolf would only be entitled to $5,382.93 in restitution.[4]

The Government counters that even if the SEC's agreement with Yellowstone is inadmissible evidence and/or even if Yellowstone had a general practice of billing non-qualified investors more than qualified investors, in light of the uncertainty surrounding the issues, a billing structure that is more favorable to the victim should be used in the Court's calculation of restitution.

After reviewing the parties' statements on restitution and accompanying documents, the Court determines that the Government has met its burden in showing that Wolf is entitled to $20,124.28 in restitution.[5] First, the Court finds that Wolf's accounts should have been billed at 2% annually, including a 1% fee billed in quarterly installments and a 1% annual fee. Wolf's investor agreement statement did not specify the annual fee that she

---

[4] In addition, the parties disagree on when the restitution calculations should start and stop for Wolf. Hansen, for example argues that the Government calculated restitution only through April of 2016 even though Wolf held her accounts with Yellowstone through April of 2017. Hansen wants them to calculate restitution through 2017 because Yellowstone did not bill Wolf's accounts that final year—i.e., this is another argument in support of under-billing. The Government has explained that it calculated restitution up through the time Hansen's scheme was uncovered, not beyond. The Court agrees with the Government in this regard.

This same pattern of varying disagreements—some big; some small—follows for each victim in this case. The Court will discuss some, but not all, of these disagreements in its decision today. Some are substantive; others are irrelevant; still others appear to be post-hoc rationalizations that Hansen is now trying to capitalize on. Even if not discussed, the Court notes that it has considered all the arguments and disagreements of the parties in this case.

[5] The difference between the amount the Government requested and what the Court has awarded Wolf is $303.86. The amount of restitution requested by the Government includes both improperly billed fees and small discrepancies between what Yellowstone billed on proper billing days and what the Government calculated a fee should have been on those days. These discrepancies range from underbilling's as little as $1.25 to overbillings up to $40.91; however, the Court is not convinced that the Government has met their burden to show these were improper under- or over-billings by Yellowstone. Rather, the Court assumes without deciding that the difference between the Government's calculated fees on proper billing days and the fee Yellowstone charged on those days is simply a difference in the timing of the fee calculation and not part of the underlying billing scheme that is before the Court.

MEMORANDUM DECISION AND ORDER - 6

agreed to pay Yellowstone, and the agreement is unclear as to whether non-qualified investors would be charged a higher fee than non-qualified investors.[6] Dkt. 164. In addition, Wolf's parents were qualified investors at Yellowstone and were billed 2% annually, thus the Court finds it was reasonable for Wolf to assume she would be billed at the same rate her parents were billed at, even though she was not a qualified investor. The Court acknowledges that Yellowstone's contracts and billing structure were often chaotic and inconsistent;[7] however, Yellowstone's own poor contract drafting should not be to the detriment of their clients. Thus, the proper rate Yellowstone should have billed Ms. Wolf's accounts is 2% annually.

Next, the Court finds that Yellowstone's annual fee should have been billed starting on the anniversary after Wolf's accounts were opened. Wolf's investor agreement states, "In addition to the quarterly fee, an annual fee will be assessed . . . annually approximately around the anniversary date of the account." Dkt. 164-7, at 7. The Court determines this language reasonably and fairly assumes the annual fees will be charged annually, starting at the end of one year following the opening of an account and not immediately (or even

---

[6] Wolf's investor agreement states, "A 'performance-based' management fee will be included within the Adviser's compensation on Exhibit A if the Client is a 'qualified' client' . . . ." Dkt. 164-7, at 2. Even if this means non-qualified investors will be charged an additional "performance-based" fee, the agreement clearly states that this will not be an automatic annual fee but that imposing the fee depended on whether Yellowstone outperforms the "Benchmark." Dkt. 164-7, at 7. The agreement does not state what the performance-based fee will be, nor does it list what the "Benchmark" composition is. Dkt. 164-7.

[7] For example, consider the annual fee Yellowstone actually billed to Wolf's accounts. In 2013–2015, Yellowstone seemingly charged Wolf two 1% fees during the first quarter of each year. Dkt. 164-8. But in 2016, it seems Yellowstone was on track to bill Wolf's accounts only one 1% annual fee and not two 1% annual fees as in years past. Dkt. 164-8. This undermines Hansen's argument that Wolf's accounts should have been billed at 3% annually because in 2016, it seems her accounts were on track to be billed at only 2% annually. Again, whether this was on purpose or in error is unknown; however, Hansen should not receive any benefit for hapless billing practices.

MEMORANDUM DECISION AND ORDER - 7

shortly) after opening an account. Thus, annual fees charged shortly after Wolf opened her accounts at Yellowstone were over charges.

The Court's final conclusion regarding Wolf's restitution is summarized below. In short, the Court finds Hansen owes restitution to Wolf in the amount of $20, 124.28.

| Aileen Wolf - Restitution Summary | |
|---|---|
| Date | Over Charges |
| **Account ****0788** | |
| 2/19/2013 | $ 2,487.96 |
| 3/15/2013 | $ 2,449.06 |
| 2/21/2014 | $ 2,380.22 |
| 2/26/2015 | $ 2,462.88 |
| **Account ****0788 Total** | **$ 9,780.12** |
| **Account ****0793** | |
| 2/19/2013 | $ 2,641.76 |
| 3/15/2013 | $ 2,600.60 |
| 2/21/2014 | $ 2,559.21 |
| 2/26/2015 | $ 2,542.59 |
| **Account ****0793 Total** | **$ 10,344.16** |
| **Grand Total** | **$ 20,124.28** |

**B. Robert Pedersen**

The Government argues that Pedersen is entitled to $669,609.28 in restitution, while Hansen argues he is only entitled to $50,344.00 in restitution. At issue are two kinds of fees: origination fees and hedging fees. The Court will briefly explain each type of fee, the parties' varying positions on those fees, and then explain its conclusion.

*1. Origination Fees*

First, the Government asserts that only origination fees charged after August 1, 2011,[8] that have a corresponding loan were authorized fees; all other origination fees,

---

[8] The second investor agreement signed by Pedersen was not dated, but Hansen's signature on the agreement was dated August 23, 2011. Dkt. 164-13. Thus, the Government treated Pedersen's second agreement as taking effect on August 1, 2011.

MEMORANDUM DECISION AND ORDER - 8

including those between May 2, 2011, and August 1, 2011, were unauthorized and refundable to Pedersen. To support its assertion, the Government cited two investor agreements with Yellowstone signed by Pedersen on May 2, 2011, and in August 2011. The May 2011 agreement did not state an allowance for loan origination fees (Dkt. 164-12), while the August 2011 agreement included an allowance for a 1.5% origination fee "for any loans" (Dkt. 164-13, at 9). Thus, origination fees that were charged on or after August 1, 2011, and corresponded with a loan to Pedersen, were allowed by the Government. The Government found four such origination fees, totaling $76,500,[9] which it excluded from its request for restitution. Although the August 2011 agreement allowed for origination fees on "any loans" (Dkt. 164-13, at 9), the Government treated origination fees charged before August 1, 2011, as unauthorized fees, even if the fee corresponded with a loan to Pedersen. Thus, the Government concludes that Yellowstone was authorized to charge Pedersen only $76,500 in origination fees.

Hansen argues that the August 2011 agreement was meant to allow Yellowstone to charge Pedersen a one-time origination fee on Pedersen's existing loans at the time Pedersen signed the new investor agreement. Dkt. 127. Pedersen's total margin balance with Yellowstone at that time was over $11.5 million dollars, and thus, in Hansen's

---

[9] In its Corrected Statement on Restitution, the Government stated the amount of allowed origination fees charged to Pedersen totaled $55,500. Dkt. 158. However, at oral argument, it was discovered that this amount was in error and the correct amount of allowed origination fees calculated by the Government was $76,500. This corrected amount was already included in the Government's calculation of restitution for Pedersen and did not change the Government's final amount.

MEMORANDUM DECISION AND ORDER - 9

opinion, Yellowstone was authorized to charge Pedersen up to $169,715[10] in origination fees. Dkt. 127.

*2. Hedging Fees*

Second, the Government argues that although Pedersen's August 2011 investment agreement allowed Yellowstone to charge a hedging fee—and there is evidence that a hedging strategy was considered and proposed—it found no evidence that a hedging strategy was ever actually executed by Yellowstone. Thus, the Government did not allow any credit for hedging fees.

Hansen counters that the hedging fee allowance in the August 2011 agreement was not conditional on the actual execution of a hedging strategy but a one-time charge of 1.75% for the *proposal* and *possible* future execution of a hedging strategy. Dkt. 127. Thus Yellowstone was authorized per this agreement to charge Pedersen $526,050 in hedging fees based on Pedersen's account balances as of August 31, 2011. Dkt. 127.

*3. Analysis of Pedersen's Restitution*

The Court determines that the Government has met its burden in showing that Pedersen is entitled to receive $669,609.28 in restitution.

First, the Court finds that Yellowstone was entitled to charge Pedersen origination fees on any loans that originated after August 1, 2011. Pedersen's August 2011 investor agreement states that Yellowstone may charge a 1.5% origination fee "for any loans[.]"

---

[10] In Hansen's Statement on Restitution, Hansen provided a table with calculations for allowed origination fees. Dkt. 127. Applying a 1.5% origination fee to the margin account balances provided by Hansen, as he argued, the Court concludes the total allowed origination fees—according to Hansen—would be $173,580.71. However, this calculation error is immaterial as will be revealed in this Order.

MEMORANDUM DECISION AND ORDER - 10

Dkt. 164-13, at 8. The Court acknowledges the complications and assumptions inherent in interpreting contracts as there exist multiple reasonable interpretations to this provision of the investor agreement.[11] However, in the spirit of calculating restitution with "reasonable certainty," *Kennedy*, 643 F.3d at 1261, and resolving uncertainties "with a view toward achieving fairness to the victim," *Gordon*, 393 F.3d at 1048, the Court finds that "any loans" reasonably and fairly applies to all loans taken out by Pedersen after August 1, 2011, which is in line with Yellowstone's actual billing practices. Thus, Yellowstone was authorized to charge Pedersen up to $76,500 in origination fees.

Next, the Court finds that Yellowstone was not entitled to charge Pedersen hedging fees because no evidence exists that a hedging strategy was ever executed by Yellowstone on Pedersen's behalf. Pedersen's August 2011 agreement states, "The following fee will be charged for the proposal *and future execution of* hedging strategy." Dkt. 164-13, at 8 (emphasis added).[12] Thus, without the actual execution of a hedging strategy, Yellowstone was not entitled to charge Pedersen any amount in hedging fees. As noted above, *see supra* note 1, Yellowstone has already returned $300,000 to Pedersen. Accordingly, when taking

---

[11] Hansen's argument that this provision authorizes Yellowstone to charge a one-time fee on Pedersen's existing margin balance is not wholly without merit as far as contract interpretation is concerned. That said, Hansen's interpretation leaves out any *future* loans that Pedersen may originate with Yellowstone. Additionally, Hansen's interpretation is not in line with Yellowstone's actual billing practices as Yellowstone continued to charge Pedersen origination fees after the August 2011 agreement was signed. Dkt. 164-4.

[12] After analyzing the Pedersen account charges submitted by the Government, the Court finds it notable that on August 10, 2011, $243,250 was charged to two of Pedersen's accounts, totaling $486,500. This amount could reasonably be assumed to be the 1.75% hedging fee that Hansen points out is allowed in the investor agreement. However, even if the agreement allowed Yellowstone to charge a one-time hedging fee to Pedersen's accounts when the August 2011 investor agreement went into effect, the fee is clearly conditional on both the proposal *and* future execution of a hedging strategy, which strategy never materialized.

MEMORANDUM DECISION AND ORDER - 11

into account that repayment, as well as the allowed management fees, the Court finds that Hansen owes Pedersen restitution in the amount of $669,609.28 as summarized below.

| Robert Pedersen - Restitution Summary | |
|---|---|
| Total Fees Billed | $ 1,155,407.28 |
| Allowed Mgmt. Fees | $ (109,298.00) |
| Allowed Origination Fees | $ (76,500.00) |
| Sept. 2011 Repayment | $ (300,000.00) |
| **Total Overbillings** | **$ 669,609.28** |

**C. Jane Dahle**

Finally, the Government asserts that Dahle is entitled to $1,606,348.15 in restitution. As reference points, the Government cites Dahle's victim impact statement, which requested $1,365,865.68 in restitution, as well as Yellowstone's letter to Dahle in April of 2017, written by new management, stating its conclusion that restitution was owing in the amount of $1,603,263.29, plus interest. Dkt. 158. Hansen argues Dahle is only entitled to $891,766.96 in restitution. Dkt. 127. The overbilling relative to Dahle is more complicated than that of the prior victims. Again, the Court will outline each disputed area, summarize the parties' positions, and then provide its analysis.

*1. Estate Planning Fees*

First, the Government states that Dahle's second investor agreement, signed September 1, 2011, allows for estate planning fees "for *any* estate planning services provided by the advisor." Dkt. 158, at 4. The Government argues that this fee is ad hoc and not an automatic fee, meaning that "estate planning fees were to be assessed *only when such services were provided*" and "not on a consistent schedule like management fees." Dkt. 158, at 4 (internal quotation marks omitted). This interpretation, the Government

MEMORANDUM DECISION AND ORDER - 12

asserts, "is supported by the fact that Yellowstone only billed estate planning fees sporadically and not on a consistent schedule like management fees." Dkt. 158, at 4. Whenever an estate planning fee was assessed, the Government assumed Hansen had provided Dahle estate planning services that justified the fee. The Government identified eleven such authorized fees billed by Yellowstone between September 1, 2011, and April 1, 2016,[13] totaling $364,630.47. Dkt. 158.

Hansen argues that the 1% estate planning fee described in Dahle's September 2011 investor agreement is an annual fee charged in addition to the 1% quarterly and 1% annual fees, for a total of 3% charged annually. Dkt. 127. Next, Hansen asserts that Dahle's August 25, 2015 investor agreement increases the estate planning fee to 2% annually (Dkt. 127-4). Finally, Hansen asserts that Dahle's August 16, 2016 agreement combines all annual fees into one, billing quarterly at 0.75% for an annual fee of 3%,[14] in addition to a one-time financial planning fee of $3,500, and a recurring annual planning fee of $1,750. Dkt. 127. Thus, Hansen claims Yellowstone was entitled to bill Dahle $641,310.08 in estate planning fees.

*2. Options Strategies Fees*

Next, the Government argues that although Dahle's August 2015 agreement

---

[13] Regarding estate planning fees that occurred after Hansen's fraud scheme was uncovered, the Government stated, "It is doubtful that Defendant provided any financial planning services to Ms. Dahle during this period, given the turmoil at Yellowstone and Dahle's representatives ongoing concerns about overbilling." Dkt. 158 n.5, at 5.

[14] In Dahle's August 16, 2016 agreement, the signature page states the "[c]lient(s) authorize(s) Custodian to deduct Yellowstone's Advisory Fees quarterly, based on the annual rate of 2.0 %." Dkt. 127-5, at 5. However, "Schedule A" attached to Dahle's August 2016 agreement states the annualized advisory fee is 3%. Dkt. 127-5, at 6.

includes a provision allowing "a 0.50% annual fee . . . for any specialized and tailored options strategy deployed in the client's accounts," the Government "did not identify any such fees that Yellowstone billed on the Dahle accounts and so did not apply any option strategies fees." Dkt. 158, at 5.

Hansen, on the other hand, argues that the 0.50% fee for specialized and tailored options strategies was billable annually. Dkt. 127. Thus, Yellowstone was entitled to bill Dahle $262,142.27 in option strategy fees.

### 3. Origination Fees

The Government argues that because Dahle's investor agreements do not mention origination fees, the entire amount Yellowstone charged Dahle in origination fees ($625,687.12) was unauthorized and refundable to Dahle. Dkt. 158. Hansen asserts that even though Dahle's investor agreements did not include a provision allowing Yellowstone to charge origination fees, Yellowstone was entitled to charge these fees because Hansen "assist[ed the Dahles] in obtaining preferred financing." Dkt. 127, at 8–9. Hansen states, "applying the one-time 1.5% origination fee that Yellowstone obtained from another investor, Yellowstone could have charged the Dahles $98,289.65." Dkt. 127, at 9.

### 4. Underbilling Between April 2016 and April 2017

After the billing scheme was exposed in April 2016, Dahle kept her accounts at Yellowstone through April 2017, and even entered a new investor agreement with Yellowstone in August 2016. Dkt. 158. The Government acknowledges that Dahle's accounts were underbilled after Hansen's fraudulent scheme was exposed, but that the Court has good reason not to credit these underbilling against Dahle's restitution. Dkt. 158.

The Government asserts that "Dahle did not learn about the true extent of the overbilling until April 2017. Had she known earlier, she may have withdrawn her accounts in 2016 or may have not agreed to Yellowstone's 3% management fee in 2016." Dkt. 158, at 7 n.6.

If the Court does credit post-scheme underbilling, the Government asserts that only underbilling that occurred between August 2016 and April 2017 should be credited against Dahle's restitution. Dkt. 158. Dahle's August 2016 investor agreement "allowed for a 3% annual management fee, which was to be billed quarterly at 0.75%. Yellowstone, however, continued to bill at the old rate of 0.25% per quarter. Accordingly, [the Government] calculated that the Dahle accounts were underbilled by $109,079.67" between August 2016 and April 2017. Dkt. 158, at 7.

Hansen argues that the Court should account for all of Yellowstone's underbillings that occurred after the end of the scheme. Dkt. 127. In addition to underbilled management fees the Government calculated between August 2016 and April 2017, Hansen argues the Court should also credit underbilled management fees that occurred between April 2016 and August 2016 against Dahle's restitution, for a total underbilling of $197,501.75. Dkt. 127.

### 5. Analysis of Dahle's Restitution

The Court determines that the Government has met its burden to show that Dahle is entitled to receive $1,606,348.16 in restitution. First, the Court finds that Yellowstone was authorized to charge Dahle estate planning fees when estate planning services were provided. Dahle's September 2011 investor agreement states, "An estate planning fee of 1.00% will be assessed for any estate planning services performed by the adviser." Dkt.

127-3, at 10. The plain language of this contract indicates that this fee is not an automatic annual fee applied to Dahle's total assets under management, but that Yellowstone may charge the fee only when estate planning services were actually provided to Dahle, which reflects Yellowstone's actual billing practices.

Second, the Court finds that although Dahle's August 2015 investor agreement authorized Yellowstone to charge a 0.50% fee "for any specialized and tailored options strategy deployed in [Dahle's] accounts," this fee was, likewise, not an automatic annual fee but conditional on an actual options strategy created and deployed in Dahle's accounts. There is no evidence that such a strategy was ever deployed in Dahle's accounts; thus, Yellowstone was not authorized to charge Dahle any options strategy fees.

Third, the Court finds that Yellowstone was not authorized to charge Dahle origination fees. None of Dahle's contracts provided to the Court state whether Yellowstone is allowed to charge Dahle origination fees. The fact that another investor was charged 1.5% in origination fees does not justify placing Dahle under the same fee structure when her investor agreements with Yellowstone do not mention such a fee.[15] That Yellowstone assisted Dahle in obtaining preferred financing is a commendable gesture and service provided by Yellowstone; however, this Court cannot allow Yellowstone to charge for these services when there is no evidence that this was the understanding between the parties. Thus, Yellowstone was not authorized to charge Dahle any origination fees.

Finally, the Court finds that the amount of Yellowstone's underbillings between

---

[15] To the contrary, the existence of an origination fee provision in other investment agreements, and the lack of such a provision in the Dahle agreements, reinforces the Government's position that Dahle should not be charged origination fees.

MEMORANDUM DECISION AND ORDER - 16

August 2016 and April 2017 will be credited against the amount due to Dahle in restitution. On August 16, 2016, Dahle entered into a new investment contract with Yellowstone after Hansen's billing scheme was exposed in April 2016. The contract was signed by both Dahle and Hansen, and it authorized Yellowstone to bill Dahle a 3% annualized fee. Dkt. 127-5, at 5–6. However, Yellowstone charged Dahle an annualized fee of only 1% between August 2016 and April 2017. Stealing money from a client early on with the intent to underbill that client in the future does not constitute adequate restitution; however, because Hansen entered into the contract with Dahle, and Dahle freely agreed to be billed by Yellowstone at a 3% annual rate, the Court finds the underbilling that occurred between August 2016 and April 2017 should be credited against the restitution owed to Dahle. The intent of restitution is "to make victims of crime whole," *Gordon*, 393 F.3d at 1048, and not to give victims of crime a payout. Thus, Yellowstone's underbilling that occurred between August 2016 and April 2017 ($109,079.67) will be credited against the amount due to Dahle in restitution as summarized below. In sum, Hansen owes Dahle restitution in the amount of $1,606.348.16.

| Jane Dahle - Restitution Summary | |
|---|---|
| Total Fees Billed | $ 3,917,639.10 |
| Allowed Mgmt. Fees | $ (1,437,580.80) |
| Allowed Estate Planning Fees | $ (364,630.47) |
| Post-scheme Underbillings (Aug. 2016-Apr. 2017) | $ (109,079.67) |
| 2015 Repayment | $ (400,000.00) |
| Total Overbillings | $ 1,606,348.16 |

## V. CONCLUSION

The Government has provided enough evidence for the Court to determine that

Wolf, Pedersen, and Dahle were victims of Hansen's wire fraud scheme, and that the total amount due to them is $2,296,081.72.

In its discretion, the Court will order that Hansen pay restitution to Wolf in the amount of $20,124.28, restitution to Pedersen in the amount of $669,609.28, and restitution to Dahle in the amount of $1,526,030.75.[16]

## VI. ORDER

IT IS HEREBY ORDERED that:

1. The Government's request for Restitution is **GRANTED**.

2. Aileen Wolf is awarded $20,124.28 in restitution. This amount is due immediately.

3. Robert Pedersen is awarded $669,609.28 in restitution. This amount is due immediately.

4. Jane Dahle is awarded $1,526,030.75 in restitution. This amount is due immediately.

DATED: October 30, 2020

David C. Nye
Chief U.S. District Court Judge

---

[16] Cameron High, Hansen's co-defendant, and the Government reached an agreement in High's case regarding restitution. *See* Case No. 4:18-cr-00035-DCN, Dkt. 49. In that case, the parties agreed that High would be responsible for five percent (5%) of the restitution amount owed to Dahle as determined by the Court in this case. As calculated, the final restitution amount owed to Dahle is $1,606,348.16. Accordingly, Hansen will be responsible for $1,526,030.75 (representing 95% of the total amount) and High will be responsible for $80,317.41 (representing 5% of the amount). The Court will enter a separate order in High's case.